**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOSEPH A. KENNEDY,
        *Plaintiff-Appellant*,

v.

BREMERTON SCHOOL DISTRICT,
        *Defendant-Appellee.*

No. 16-35801

D.C. No.
3:16-cv-05694-RBL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge, Presiding

Argued and Submitted June 12, 2017
Seattle, Washington

Filed August 23, 2017

Before: DOROTHY W. NELSON, MILAN D. SMITH,
JR., and MORGAN CHRISTEN, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Concurrence by Judge Milan D. Smith, Jr.

## SUMMARY[*]

### Civil Rights

The panel affirmed the district court's denial of preliminary injunctive relief in an action brought by a high school coach who alleged that his school district retaliated against him for exercising his First Amendment rights when it suspended him for kneeling and praying on the football field's fifty-yard line in view of students and parents immediately after high school football games.

Plaintiff sought an injunction ordering the school district to (1) cease discriminating against him in violation of the First Amendment, (2) reinstate him as a football coach, and (3) allow him to kneel and pray on the fifty-yard line immediately after high school football games.

The panel held that plaintiff spoke as a public employee, not as a private citizen when he kneeled and prayed on the fifty-yard line immediately after games in school logoed-attire while in view of students and parents. The panel held that plaintiff had a professional responsibility to communicate demonstratively to students and spectators and he took advantage of his position to press his particular views upon the impressionable and captive minds before him. The panel held that because plaintiff's demonstrative speech fell within the scope of his typical job responsibilities, he spoke as a public employee, and the district was permitted to order him not to speak in the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

manner that he did. Plaintiff accordingly could not show a likelihood of success on the merits of his First Amendment retaliation claim, and was not entitled to a preliminary injunction.

Specially concurring, Judge M. Smith wrote separately to share his view that the school district's action were also justified to avoid violating the Establishment Clause.

## COUNSEL

Rebekah Ricketts (argued) and Benjamin D. Wilson, Gibson Dunn & Crutcher LLP, Dallas, Texas; Daniel S.J. Nowicki, Gibson Dunn & Crutcher LLP, Palo Alto, California; Jeffrey Paul Helsdon, Oldfield & Helsdon PLLC, Fircrest, Washington; Hiram Sasser and Michael Berry, First Liberty Institute, Plano, Texas; Anthony J. Ferate, Ferate PLLC, Edmond, Oklahoma; for Plaintiff-Appellant.

Michael B. Tierney (argued) and Paul Correa, Tierney & Blakney P.C., Seattle, Washington, for Defendant-Appellee.

Andrew L. Nellis (argued) and Richard B. Katskee, Americans United for Separation of Church and State, Washington, D.C.; David L. Barkey, Anti-Defamation League, Boca Raton, Florida; Jeffrey I. Pasek, Cozen O'Connor, New York, New York; for Amici Curiae Americans United for the Separation of Church and State; The Anti-Defamation League; Central Conference of American Rabbis; Disciples Justice Action Network of the Christian Church (Disciples of Christ); Equal Partners in Faith; Hadassah, the Women's Zionist Organization of America, Inc.; Hindu American Foundation; The Interfaith Alliance; Jewish Social Policy Action Network; People for

the American Way Foundation; Union for Reform Judaism; and Women of Reform Judaism.

Gerald J. Russello and Daniel A. McLaughlin, Sidley Austin LLP, New York, New York; Collin P. Wedel, Sidley Austin LLP, Los Angeles, California; Christopher R. Mills, Sidley Austin LLP, Washington, D.C.; for Amicus Curiae Former Professional Football Players Steve Largent and Chad Hennings.

Justin D. Park, Bellevue, Washington, for Amicus Curiae Garfield High School Coaches Kellen Alley and Joseph Thomas.

## OPINION

M. SMITH, Circuit Judge:

Bremerton High School (BHS) football coach Joseph A. Kennedy appeals from the district court's order denying his motion for a preliminary injunction that would require Bremerton School District (BSD or the District) to allow Kennedy to kneel and pray on the fifty-yard line in view of students and parents immediately after BHS football games. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  Bremerton School District

BSD is located in Kitsap County, Washington, across the Puget Sound from Seattle.  The District is home to approximately 5,057 students, 332 teachers, and 400 non-teaching personnel.  BSD is religiously diverse.  Students

and families practice, among other beliefs, Judaism, Islam, the Bahá'í faith, Buddhism, Hinduism, and Zoroastrianism.

BSD employed Kennedy as a football coach at Bremerton High School from 2008 to 2015. Kennedy served as an assistant coach for the varsity football team and also as the head coach for the junior varsity football team. Kennedy's contract expired at the end of each football season. It provided that BSD "entrusted" Kennedy "to be a coach, mentor and role model for the student athletes." Kennedy further agreed to "exhibit sportsmanlike conduct at all times," and acknowledged that, as a football coach, he was "constantly being observed by others."

Kennedy's formal job description required him to assist the head coach with "supervisory responsibilities," "[a]dhere to Bremerton School District policies and administrative regulations," "communicate effectively" with parents, "maintain positive media relations," and "[o]bey all the Rules of Conduct before players and the public as expected of a Head Coach," including the requirement to "use proper conduct before the public and players at all times." Consistent with his responsibility to serve as a role model, Kennedy's contract required that, "[a]bove all" else, Kennedy would endeavor not only "to create good athletes," but also "good human beings."

## B. Kennedy's Religious Beliefs and Past Practices

Kennedy is a practicing Christian. Between 2008 and 2015, he led students and coaching staff in a locker-room prayer prior to most games. He also participated in prayers that took place in the locker room after the games had ended. Kennedy insists these activities predated his involvement with the program, and were engaged in as a matter of school

tradition.  His religious beliefs do not require him to *lead* any prayer before or after BHS football games.

Kennedy's religious beliefs *do* require him to give thanks through prayer at the end of each game for the players' accomplishments and the opportunity to be a part of their lives through football.  Specifically, "[a]fter the game is over, and after the players and coaches from both teams have met to shake hands at midfield," Kennedy feels called to "take a knee at the 50-yard line and offer a brief, quiet prayer of thanksgiving for player safety, sportsmanship, and spirited competition."  Kennedy's prayer usually lasts about thirty seconds.  He wears a shirt or jacket bearing a BHS logo when he prays at midfield.  Because his "prayer lifts up the players and recognizes their hard work and sportsmanship during the game," Kennedy's religious beliefs require him to pray on the actual field where the game was played.

Kennedy began performing these prayers when he first started working at BHS.  At the outset, he prayed alone. Several games into his first season, however, a group of BHS players asked Kennedy whether they could join him.  "This is a free country," Kennedy replied, "You can do what you want."  Hearing that response, the students elected to join him.  Over time, the group grew to include the majority of the team.  Sometimes the BHS players even invited the opposing team to join.

Eventually, Kennedy's religious practice evolved to something more than his original prayer.  He began giving short motivational speeches at midfield after the games. Students, coaches, and other attendees from both teams were invited to participate.  During the speeches, the participants kneeled around Kennedy, who raised a helmet from each team and delivered a message containing religious content.

Kennedy subsequently acknowledged that these motivational speeches likely constituted prayers.

## C. The September 17, 2015, Letter from BSD to Kennedy

The District first learned that Kennedy was leading locker-room prayers and praying on the field in September 2015, when an employee of another school district mentioned the post-game prayers to a BSD administrator.[1] The discovery prompted an inquiry into whether Kennedy was complying with the school board's policy on "Religious-Related Activities and Practices." Pursuant to that policy, "[a]s a matter of individual liberty, a student may of his/her own volition engage in private, non-disruptive prayer at any time not in conflict with learning activities." In addition, "[s]chool staff shall neither encourage nor discourage a student from engaging in non-disruptive oral or silent prayer or any other form of devotional activity."

Kennedy was candid and cooperative throughout the District's inquiry. The investigation revealed that coaching staff had received little training regarding the District's policy. Accordingly, BSD Superintendent Aaron Leavell sent Kennedy a letter on September 17, 2015, to clarify the District's prospective expectations.

Leavell explained that Kennedy's two practices were "problematic" under the Establishment Clause, but he acknowledged that they were well-intentioned and that Kennedy had "not actively encouraged, or required,

---

[1] The District had not received complaints up to that point. As the community became aware of Kennedy's practices, however, the District reports that individuals "expressed concern about Mr. Kennedy's actions."

[student] participation." Leavell advised Kennedy that he could continue to give inspirational talks, but "[t]hey must remain entirely secular in nature, so as to avoid alienation of any team member." He further advised that "[s]tudent religious activity must be entirely and genuinely student-initiated, and may not be suggested, encouraged (or discouraged), or supervised by any District staff." Leavell further counseled Kennedy that "[i]f students engage in religious activity, school staff may not take any action likely to be perceived by a reasonable observer, who is aware of the history and context of such activity at BHS, as endorsement of that activity." Lastly, Leavell stressed that Kennedy was

> free to engage in religious activity, including prayer, so long as it does not interfere with job responsibilities. Such activity must be physically separate from any student activity, and students may not be allowed to join such activity. In order to avoid the perception of endorsement discussed above, such activity should either be non-demonstrative (*i.e.*, not outwardly discernible as religious activity) if students are also engaged in religious conduct, or it should occur while students are not engaging in such conduct.

## D. Kennedy Responds via an October 14th Letter

By this point, Kennedy's prayers had "generated substantial publicity." Comments on social media led the District to be concerned that BHS would not be able to secure its field after the September 18, 2015, game, assuming—as it suspected—that a crowd would come down from the stands to join Kennedy's on-field prayer. The

District was "not able to prevent that from happening" based on the state of its preparations, and it decided that it would not "prevent access to the field at that point." On the day of the game, the school's concerns were not realized, however, because after receiving the District's letter, Kennedy temporarily stopped praying on the field while students were around. Instead, after the September 18th game, Kennedy gave a short motivational speech "that included no mention of religion or faith." Then, once "everyone else had left the stadium," he walked to the fifty-yard line, knelt, and prayed alone.

After complying in this manner for several weeks, Kennedy wrote the District through his lawyer on October 14, 2015. He requested a religious accommodation under the Civil Rights Act of 1964 that would allow him to "continue his practice of saying a private, post-game prayer at the 50-yard line" immediately following BHS football games. The letter opined that Kennedy's religious expression occurred during "non-instructional hours" because, according to Kennedy, "his official coaching duties ceased" after the games had ended. The letter also acknowledged that Kennedy's prayers were "audibl[e]," but stressed that "he does not pray in the name of a specific religion," and "neither requests, encourages, nor discourages students from participating in" his prayer. Lastly, the letter announced that Kennedy would resume praying on the fifty-yard line at the October 16, 2015, game.

Kennedy's intention to pray on the field following the October 16th game "was widely publicized, including through [Kennedy's] own media appearances." On the day of the game, the District had not yet responded to Kennedy's letter, but Kennedy nonetheless proceeded as he had indicated. Once the final whistle blew, Kennedy shook

hands with the opposing team and waited until most of the BHS players were singing the fight song to the audience in the stands. Then, he knelt on the fifty-yard line, bowed his head, closed his eyes, "and prayed a brief, silent prayer." According to Kennedy, while he was kneeling with his eyes closed, "coaches and players from the opposing team, as well as members of the general public and media, spontaneously joined [him] on the field and knelt beside [him]." In the days after the game, pictures were "published in various media" depicting Kennedy praying while surrounded by players and members of the public.

The District maintains that while Kennedy was walking to the fifty-yard line, "[t]here were people jumping the fence and others running among the cheerleaders, band[,] and players." Afterwards, "the District received complaints from parents of band members who were knocked over in the rush of spectators on to the field." Sometime after the game, members of a Satanist religion contacted the District and said they "intended to conduct ceremonies on the field after football games if others were allowed to." Ultimately, the District made arrangements with the Bremerton Police Department to secure the field after games, then posted signs, made "robocalls" to District parents, and "otherwise put the word out to the public that there would be no [future] access to the field." Representatives of the Satanist religion showed up at the next game, "but they did not enter the stands or go on the field after learning that the field would be secured."[2]

---

[2] Kennedy contends that prior to this date, BHS had allowed parents and fans to walk onto the field after games to socialize and congratulate the players. He does not meaningfully contest that the field was not an

## E.  The District's October 23rd and October 28th Letters

Leavell sent Kennedy a second letter on October 23, 2015.  He thanked Kennedy for his "efforts to comply with the September 17 directives."   Still, he explained that Kennedy's conduct at the game on October 16th was inconsistent with the District's requirements.   Leavell emphasized "that the District does not prohibit prayer or other religious exercise by employees while on the job," but "such exercise must not interfere with the performance of job responsibilities, and must not lead to a perception of District endorsement of religion."

According to the District, Kennedy had not met those requirements because "paid assistant coaches in District athletic programs are responsible for supervision of students not only prior to and during the course of games, but also during the activities *following* games and until players are released to their parents or otherwise allowed to leave." (emphasis added).  The District confirmed with Kennedy's head coach "that for over ten years, all assistant coaches have had assigned duties both before and after each game and have been expected to remain with the team until the last student has left the event."  Thus, the District told Kennedy,

> [W]hen you engaged in religious exercise immediately following the game on October 16, you were still on duty for the District. You were at the event, and on the field, under the game lights, in BHS-logoed attire, in front of an audience of event attendees, solely by virtue of your employment by the District.

open forum while in use by the District, however, and that the District retained the right to limit public access.

> The field is not an open forum to which
> members of the public are invited following
> completion of games; but even if it were, you
> continued to have job responsibilities,
> including the supervision of players. While
> [BSD] understand[s] that your religious
> exercise was fleeting, it nevertheless drew
> you away from your work. More
> importantly, any reasonable observer saw a
> District employee, on the field only by virtue
> of his employment with the District, still on
> duty, under the bright lights of the stadium,
> engaged in what was clearly, given your prior
> public conduct, overtly religious conduct.[3]

The District reiterated that it "can and will" accommodate
"religious exercise that would not be perceived as District
endorsement, and which does not otherwise interfere with
the performance of job duties." To that end, it suggested that
"a private location within the school building, athletic
facility or press box could be made available to [Kennedy]
for brief religious exercise before and after games."
Kennedy, of course, could also resume his prior practice of
praying on the fifty-yard line after the stadium had emptied.
Because the "[d]evelopment of accommodations is an
interactive process," the District invited Kennedy to offer his
own suggestions. The District also reminded Kennedy that
"[w]hile on duty for the District as an assistant coach, you
may not engage in demonstrative religious activity, readily

---

[3] Kennedy appears to have abandoned his argument that he was not
"on duty" after the games. Instead, he contends that he never received a
post-game assignment "that would prohibit [him] from engaging in
religious expression lasting no more than 30 seconds."

observable to (if not intended to be observed by) students and the attending public."

## F.  Kennedy Continues Praying on the Fifty-Yard Line

Kennedy's legal representatives responded to the District's letter by informing the media that the only acceptable outcome would be for the District to permit Kennedy to pray on the fifty-yard line immediately after games.[4]  Kennedy's conduct bore that out.  He prayed on the fifty-yard line immediately after the game on October 23rd, and once again after the game on October 26th.

The District subsequently notified Kennedy in an October 28th letter that he had violated the District's directives and would be placed on paid administrative leave from his position as an assistant coach.  The District also publicly-released a document entitled "Bremerton School District Statement and Q&A Regarding Assistant Football Coach Joe Kennedy," which detailed the history of the District's interactions with Kennedy and explained its views regarding the constitutionality of Kennedy's conduct.

While Kennedy was on leave, he was not allowed to participate in BHS football program activities.  Kennedy could still attend the games in his capacity as a member of the public.  At the October 30, 2015, game, which Kennedy attended as a member of the public, Kennedy prayed in the bleachers while wearing his BHS apparel, surrounded by others, and with news cameras recording his actions.

---

[4] Kennedy now contends that the District's accommodations were inadequate because "BSD did not explain how [his] religious expression would be accommodated at away games," where BSD does not have direct control over the facilities.

While Kennedy was on leave, and during the time that he temporarily ceased performing on-field prayers, BHS players did not pray on their own after BHS football games. Rather, during the 2015 season, the District observed players praying on the field only at the games where Kennedy elected to do so. The District's public statement thus opined "[i]t is very likely that over the years, players have joined in these activities because to do otherwise would mean potentially alienating themselves from their team, and possibly their coaches." The District also surmised that "students required to be present by virtue of their participation in football or cheerleading will necessarily suffer a degree of coercion to participate in religious activity when their coaches lead or endorse it." The District's statement acknowledged that there was "no evidence" that students were "*directly* coerced to pray with Kennedy." (emphasis added). The District also acknowledged that Kennedy "complied" with directives "not to *intentionally* involve students in his on-duty religious activities." (emphasis added).

## G. Kennedy's Evaluation and Decision Not to Reapply for a Job

After the season ended, the District began its annual process of providing its coaches with performance reviews. This starts with written evaluations by the head coach and the school's athletic director. The assistant coach then typically meets with one of those two people to go over his performance evaluation. If the coach is unsatisfied with the head coach or athletic director's evaluation, he can involve the school principal or the District. Kennedy had previously participated in this review—and had received uniformly positive evaluations—but he did not participate in 2015. Kennedy's supervisors nonetheless submitted their

assessments.    The athletic director recommended that Kennedy not be rehired because Kennedy "failed to follow district policy" and "failed to supervise student-athletes after games due to his interactions with [the] media and [the] community."

The head coach of the varsity football team left the job at the conclusion of the 2015 season.  The one-year contracts also expired for all six of the assistant football coaches.  The District therefore opened up to application all seven of the football coaching positions.  Kennedy did not apply for a coaching position during the 2016 season.

## H.  Kennedy Files Suit

Kennedy commenced this action in the Western District of Washington on August 9, 2016.  He asserts that his rights under the First Amendment and Title VII of the Civil Rights Act of 1964 were violated.    Kennedy moved for a preliminary injunction on August 24, 2016, arguing that he would succeed on the merits of his claim that BSD retaliated against him for exercising his First Amendment right to free speech.[5]   Kennedy sought an injunction ordering BSD to (1) cease discriminating against him in violation of the First Amendment, (2) reinstate him as a BHS football coach, and (3) allow him to kneel and pray on the fifty-yard line immediately after BHS football games.

---

[5] Kennedy brings his First Amendment retaliation claim pursuant to 42 U.S.C. § 1983.   The First Amendment applies against the State pursuant to the Fourteenth Amendment.  *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 336 n.1 (1995) ("The term 'liberty' in the Fourteenth Amendment to the Constitution makes the First Amendment applicable to the States.").

The district court denied the requested preliminary injunction on September 19, 2016. Applying the five-step framework laid out in *Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009), the court held that Kennedy was unlikely to prevail on the merits of his First Amendment retaliation claim because Kennedy spoke as a public employee and BSD's conduct was justified by its need to avoid violating the Establishment Clause. In reaching these conclusions, the court observed that "Kennedy was dressed in school colors," "chose a time and event [that] . . . is a big deal" for students, and "used that opportunity to convey his religious views" while "[h]e was still responsible for the conduct of his students." The court also found that Kennedy's prayer resulted in "subtle coercion" because "[i]f you are an athlete, you are impressionable, and you . . . want to please your coach to get more playing time, to shine." The court further concluded that a reasonable observer familiar with the relevant context "would have seen [Kennedy] as a coach, participating, in fact[,] leading an orchestrated session of faith." Given that Kennedy could not demonstrate a likelihood of success on the merits, the district court did not address the remaining preliminary injunction factors. Kennedy filed a timely notice of appeal on October 3, 2016.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

A plaintiff seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits of his claim, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Sanders Cty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 744 (9th Cir. 2012).

"[W]e review the denial of a preliminary injunction for abuse of discretion." *Harris v. Bd. of Supervisors, L.A. Cty.*, 366 F.3d 754, 760 (9th Cir. 2004). "The district court necessarily abuses its discretion when it bases its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Id.* (internal quotation marks omitted). Where, as here, "the district court is alleged to have relied on an erroneous legal premise, we review the underlying issues of law *de novo*." *Id.*; *see also Sanders*, 698 F.3d at 744 ("[W]here a district court's denial of a preliminary injunction motion rests solely on a premise of law and the facts are either established or undisputed, our review is *de novo*." (internal quotation marks omitted)).

## ANALYSIS

Kennedy contends that the district court erred by concluding that he was not likely to succeed on the merits of his claim that BSD placed him on paid administrative leave in retaliation for exercising his First Amendment right to free speech.

First Amendment retaliation claims are governed by the framework in *Eng*. *See* 552 F.3d at 1070–72. Kennedy must show that (1) he spoke on a matter of public concern, (2) he spoke as a private citizen rather than a public employee, and (3) the relevant speech was a substantial or motivating factor in the adverse employment action. *Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1259 (9th Cir. 2016) (citing *Eng*, 552 F.3d at 1070–71). Upon that showing, the State must demonstrate that (4) it had an adequate justification for treating Kennedy differently from other members of the general public, or (5) it would have taken the adverse employment action even absent the protected speech. *Id.* (citing *Eng*, 552 F.3d at 1070–72). "[A]ll the factors are necessary, in the sense that failure to meet any one of them

is fatal to the plaintiff's case." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 n.4 (9th Cir. 2013) (en banc). Accordingly, "a reviewing court is free to address a potentially dispositive factor first rather than addressing each factor sequentially." *Coomes*, 816 F.3d at 1260 (internal quotation marks omitted).

Here, the parties do not contest that Kennedy spoke on a matter of public concern (*Eng* factor one), that the relevant speech was a substantial or motivating factor in the District's decision to place Kennedy on leave (*Eng* factor three), and that the District would not have taken the adverse employment action in the absence of the relevant speech (*Eng* factor five). Thus, we need consider only whether Kennedy spoke as a private citizen or a public employee (*Eng* factor two), and whether BSD's conduct was adequately justified by its need to avoid an Establishment Clause violation (*Eng* factor four). We conclude that Kennedy spoke as a public employee, not as a private citizen, and therefore decline to reach whether BSD justifiably restricted Kennedy's speech to avoid violating the Establishment Clause. Kennedy accordingly cannot show a likelihood of success on the merits of his First Amendment retaliation claim, and is not entitled to the preliminary injunction he seeks.[6]

---

[6] The parties have not briefed the remaining preliminary injunction factors, and we need not reach them in light of this conclusion.

**I.  Kennedy spoke as a public employee, and not as a private citizen, when he prayed on the fifty-yard line in view of students and parents immediately after BHS football games.**

### A.  Governing Law

"[P]ublic employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).  Rather, they retain the right "in certain circumstances[] to speak as a citizen addressing matters of public concern."  *Id.*  Courts therefore must decide under the second *Eng* factor whether an official spoke as a citizen, and thus had First Amendment rights to exercise, or whether the official spoke in his capacity as a public employee, and therefore did not.

*Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968), laid a foundation for this inquiry.  The Court held that a school district violated a teacher's right to free speech when it fired the teacher for writing a letter to a local newspaper criticizing the school board's handling of a tax proposal. *Id.* at 564–65.  The Court noted that the statements in the letter were not "directed towards any person with whom [the teacher] would normally be in contact in the course of his daily work." *Id.* at 569–70.  Moreover, publication of the letter did not "imped[e] the teacher's proper performance of his daily duties in the classroom" or "interfere[] with the regular operation of the schools generally."  *Id.* at 572–73.  Because the school had no greater interest in limiting the teacher's speech than it did "in limiting a similar contribution by any member of the general public," *id.* at 573, the teacher spoke as a private citizen, and the speech itself could not furnish a basis for the teacher's dismissal from public employment, *id.* at 574.

The Court refined this inquiry in *Garcetti v. Ceballos*, 547 U.S. 410 (2006). There it held "that when public employees make statements *pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421 (emphasis added). Applying that reasoning, "the Court found that an internal memorandum prepared by a prosecutor in the course of his ordinary job responsibilities constituted unprotected employee speech." *Lane v. Franks*, 134 S. Ct. 2369, 2378 (2014) (citing *Garcetti*, 547 U.S. at 424). The prosecutor spoke as a public employee because he was "fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case." *Garcetti*, 547 U.S. at 421. In other words, "[the prosecutor's] expressions were made pursuant to his duties as a calendar deputy," *id.*, and "[r]estricting speech that owes its existence to a public employee's professional responsibilities," the Court said, "does not infringe any liberties the employee might have enjoyed as a private citizen," *id.* at 421–22.

*Garcetti* also emphasized "that various easy heuristics are insufficient for determining whether an employee spoke pursuant to his professional duties." *Dahlia*, 735 F.3d at 1069; *see also Garcetti*, 547 U.S. at 420–21, 424. For instance, it was "not dispositive" that the prosecutor "expressed his views inside his office, rather than publicly," *Garcetti*, 547 U.S. at 420, or that the memorandum "concerned the subject matter of [the prosecutor's] employment," *id.* at 421. The Court rejected the suggestion that employers could restrict their employees' rights "by creating excessively broad job descriptions." *Id.* at 424. It ultimately instructed that

> The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Id.* at 424–25.

Following *Garcetti*, we clarified that "the determination whether the speech in question was spoken as a public employee or a private citizen presents a mixed question of fact and law." *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th Cir. 2008). "First, a factual determination must be made as to the scope and content of a plaintiff's job responsibilities." *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966 (9th Cir. 2011) (internal quotation marks omitted). "Second, the ultimate constitutional significance of those facts must be determined as a matter of law." *Id.* (internal quotation marks omitted).

Helpfully, in 2011, we applied these instructions in a First Amendment retaliation case involving a teacher employed by a public school. The teacher argued that he spoke as a private citizen when he decorated his classroom with two large banners that conveyed a religious message. *Johnson*, 658 F.3d at 965. We held that the teacher's religious speech was "unquestionably of inherent public concern," *id.* at 966, but that he nonetheless "spoke as an employee, not as a citizen," *id.* at 970.

At the first step, we observed that Johnson (the teacher) did "not hold a unique or exotic government position"—he "perform[ed] the ordinary duties of a math teacher." *Id.* at 967. In defining those duties, we found that "expression is a teacher's stock in trade, the commodity [he] sells to [his] employer in exchange for a salary." *Id.* (internal quotation marks and alteration omitted). So, it was "irrelevant . . . to the question of whether Johnson spoke as a citizen or as an employee" that "the banners were not part of Johnson's curriculum." *Id.* at 967 n.13. After all, "teachers do not cease acting as teachers each time the bell rings or the conversation moves beyond the narrow topic of curricular instruction." *Id.* at 967–68.

We further observed that Johnson hung the banners pursuant to a long-standing policy permitting teachers to decorate their classrooms subject to specific limitations. *Id.* at 967. Accordingly, we found that Johnson's speech occurred "while performing a function [] squarely within the scope of his position"; "[h]e was not running errands for the school in a car adorned with sectarian bumper stickers," for instance, "or praying with people sheltering in the school after an earthquake." *Id.* Adding it up, because Johnson was communicating with his students, "as a practical matter," we found it was "beyond possibility for fairminded dispute that the scope and content of Johnson's job responsibilities did not include speaking to his class in his classroom during class hours." *Id.* (internal quotation marks, alteration, and emphasis omitted).

At step two, we assessed the constitutional significance of those facts by asking "whether Johnson's speech owe[d] its existence to his position, or whether he spoke just as any non-employee citizen could have." *Id.* For several reasons, we held "[t]he answer [was] clear": "Johnson did not act as

an ordinary citizen when 'espousing God as opposed to no God' in his classroom." *Id.* To start, "[a]n ordinary citizen could not have walked into Johnson's classroom and decorated the walls as he or she saw fit, anymore than an ordinary citizen could demand that students remain in their seats and listen to whatever idiosyncratic perspective or sectarian viewpoints he or she wished to share." *Id.* at 968. "Unlike Pickering," moreover, "who wrote a letter to his local newspaper as any citizen might, . . . Johnson took advantage of his position to press his particular views upon the impressionable and captive minds before him." *Id.* (internal quotation marks and citation omitted). More generally, "because of the position of trust and authority [teachers] hold and the impressionable young minds with which they interact," we held that "teachers *necessarily* act as teachers for purposes of a *Pickering* inquiry when [1] at school or a school function, [2] in the general presence of students, [3] in a capacity one might reasonably view as official." *Id*. Applying that rule, Johnson fit the parameters. The religious speech "at issue" therefore "owe[d] its existence to Johnson's position as a teacher." *Id.* at 970. And, because the speech fell within the ordinary scope of Johnson's professional responsibilities, the school "acted well within constitutional limits in ordering Johnson not to speak in a manner it did not desire."[7] *Id.*

---

[7] Kennedy calls our attention to *Dahlia* and *Lane*. While we draw guidance from those decisions, they did not work an appreciable change to the legal inquiry required under the second *Eng* factor.

In *Lane*, the Supreme Court reiterated that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether [the subject matter of the speech] merely concerns those duties." 134 S. Ct. at 2379. It held that "[t]ruthful testimony under oath by a public employee *outside the scope*

## B.  Application

Applying the foregoing principles, Kennedy spoke as a public employee, and not as a private citizen.  Before undertaking our analysis, two critical points deserve attention.  First, the relevant "speech at issue" involves kneeling and praying on the fifty-yard line *immediately* after games *while in view of students and parents*.  *See Lane*, 134 S. Ct. at 2379.  It is not, as Kennedy contends, praying on the fifty-yard line "silently and alone."  We know this because Kennedy was offered (and, for a time, accepted) an accommodation permitting him to pray on the fifty-yard line after the stadium had emptied and students had been released to the custody of their parents.  His refusal of that accommodation indicates that it is essential that his speech be delivered in the presence of students and spectators.  Second, for the same reason, the "speech at issue" is *directed* at least in part to the students and surrounding spectators; it

---

*of his ordinary job duties* is speech as a citizen for First Amendment purposes*." Id.* at 2378 (emphasis added).

In *Dahlia*, we reiterated that the second *Eng* factor requires a practical, fact-specific inquiry, and that courts may not rely solely on a generic job description. *See* 735 F.3d at 1070–71. We also articulated several "guideposts" for determining whether an individual acted within the scope of their professional duties. *Id.* at 1073–74. These included (1) "whether or not the employee confined his communications to his chain of command," (2) "the subject matter of the communication," and (3) whether a public employee's speech is "in direct contravention to his supervisor's orders." *Id.* at 1074–75. While we are mindful of these factors, they stem from the context *Dahlia* confronted—a police officer reporting abuse that occurred in his own police department. *See id.* at 1064–65. We find *Johnson* more informative for our purposes than either *Dahlia* or *Lane* because *Johnson* specifically addressed teacher speech in the public school context. *See Johnson*, 658 F.3d at 967–68; *see also Coomes*, 816 F.3d at 1259–61.

is not solely speech directed to God. Hence, the question under the second *Eng* factor is whether this demonstrative communication to students and spectators "is itself ordinarily within the scope of [Kennedy's] duties." *Id.*

### 1. Factual determination of Kennedy's job responsibilities.

Kennedy's job did not merely require him to supervise students in the locker room, at practice, and before and after games. Nor was it limited to treating injuries and instructing players about techniques related to football. Rather, in addition to these duties, BSD "entrusted" Kennedy "to be a coach, mentor and role model for the student athletes." Kennedy further agreed to "exhibit sportsmanlike conduct at all times," and acknowledged that, as a football coach, he was "constantly being observed by others." The District also required Kennedy to "communicate effectively" with parents, "maintain positive media relations," and "[o]bey all the Rules of Conduct before players and the public as expected of a Head Coach," including the requirement to "use proper conduct before the public and players at all times." Consistent with his duty to serve as a role model to students, Kennedy's contract required that, "[a]bove all" else, Kennedy would endeavor not only "to create good athletes," but also "good human beings."

Kennedy's job, in other words, involved modeling good behavior while acting in an official capacity in the presence of students and spectators. Kennedy's amici agree. According to former professional football players Steve Largent and Chad Hennings, for instance, a football coach "serve[s] as a personal example." That is what the District hired Kennedy to do, when he was in the presence of students and parents: communicate a positive message through the example set by his own conduct. Any person

who has attended a high school sporting event likely knows that this is true. To illustrate, when a referee makes a bad call, it is a coach's job to respond maturely. In doing so, he provides an example to players and spectators. Likewise, when a parent hassles a coach *after* a game seeking more playing time for her child, a calm reaction by the coach teaches the player about appropriate conduct. By acknowledging that he was "constantly being observed by others," Kennedy plainly understood that demonstrative communication fell within the compass of his professional obligations. And tellingly, Kennedy's insistence that his demonstrative speech occur in view of students and parents suggests that Kennedy prayed pursuant to his responsibility to serve as a role model and moral exemplar. Were that not evident enough from Kennedy's rejection of BSD's accommodations, Kennedy's off-field conduct bolsters the inference. In particular, his media appearances and prayer in the BHS bleachers (while wearing BHS apparel and surrounded by others) signal his intent to send a message to students and parents about appropriate behavior and what he values as a coach.

Practically speaking, Kennedy's job as a football coach was also akin to being a teacher. *See Grossman v. S. Shore Pub. Sch. Dist.*, 507 F.3d 1097, 1100 (7th Cir. 2007) ("Staff that interact with students play a role similar to teachers."). "While at the high school" he was "not just any ordinary citizen." *Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 522 (9th Cir. 1994). He was "one of those especially respected persons chosen to teach" on the field, in the locker room, and at the stadium. *Id.* He was "clothed with the mantle of one who imparts knowledge and wisdom." *Id.* Like others in this position, "expression" was Kennedy's "stock in trade." *Johnson*, 658 F.3d at 967. Kennedy's expressions also carried weight—as the district court said,

"the coach is more important to the athlete than the principal." *See also* Br. of Americans United for Separation of Church and State et al. as Amici Curiae Supporting Appellee at 7–8 [hereinafter AUSCS Br.] (former BHS player states that Kennedy was a "parental figure" to the team).

As a high school football coach, it was also Kennedy's duty to use his words and expressions to "instill[] values in the team." *Borden v. Sch. Dist. of Tp. of E. Brunswick*, 523 F.3d 153, 173 n.15 (3rd Cir. 2008). As amici observe, "many mothers look to the coaches of their son's football team as the last best hope to show their son[s] what it means to become a man—a real man[.]" AUSCS Br. at 7 (quoting John Harbaugh, *Why Football Matters*, Balt. Ravens (Apr. 22, 2015), http://tinyurl.com/kn5fdhh). The record reflects that Kennedy pursued that task. For example, Kennedy gave motivational speeches to students and spectators after the games. Moreover, BHS players did not pray on their own in Kennedy's absence. Rather, the District observed players praying on the field only at the games where Kennedy personally elected to do so.

Finally, just as Johnson's job responsibilities included "speaking to his class in his classroom during class hours," Kennedy's included speaking demonstratively to spectators at the stadium after the game through his conduct. *Johnson*, 658 F.3d at 967. Kennedy's demonstrative speech thus occurred "while performing a function" that fit "squarely within the scope of his position." *Id.* After all, Kennedy spoke at a school event, on school property, wearing BHS-logoed attire, while on duty as a supervisor, and in the most prominent position on the field, where he knew it was inevitable that students, parents, fans, and occasionally the media, would observe his behavior.

In sum, Kennedy's job was multi-faceted, but among other things it entailed both teaching and serving as a role model and moral exemplar. When acting in an official capacity in the presence of students and spectators, Kennedy was also responsible for communicating the District's perspective on appropriate behavior through the example set by his own conduct.

### 2. The constitutional significance of Kennedy's job duties.

Mindful of those facts, by kneeling and praying on the fifty-yard line immediately after games while in view of students and parents, Kennedy was sending a message about what he values as a coach, what the District considers appropriate behavior, and what students should believe, or how they ought to behave. Because such demonstrative communication fell well within the scope of Kennedy's professional obligations, the constitutional significance of Kennedy's job responsibilities is plain—he spoke as a public employee, not as a private citizen, and his speech was therefore unprotected.

Each of the guideposts we have established in this context suggests that Kennedy spoke as a public employee. First, "teachers *necessarily* act as teachers for purposes of a *Pickering* inquiry when [1] at school or a school function, [2] in the general presence of students, [3] in a capacity one might reasonably view as official." *Johnson*, 658 F.3d at 968. Kennedy's conduct easily meets all three of these conditions.

Next, as *Johnson* and *Coomes* instruct, if Kennedy's "speech 'owes its existence' to his position as a teacher, then [Kennedy] spoke as a public employee, not as a citizen, and our inquiry is at an end." *Id.* at 966 (quoting *Garcetti*,

547 U.S. at 421–22). Here, an ordinary citizen could not have prayed on the fifty-yard line immediately after games, as Kennedy did, because Kennedy had special access to the field by virtue of his position as a coach. The record demonstrates as much. Representatives of a Satanist religion arrived at the stadium "to conduct ceremonies on the field after [a] [BHS] football game[.]" They were forced to abandon this effort after they learned that the field was not an open forum. Thus, the precise speech at issue—kneeling and praying on the fifty-yard line immediately after games while in view of students and parents—could not physically have been engaged in by Kennedy if he were not a coach. Kennedy's speech therefore occurred only because of his position with the District.**[8]**

Lastly, given that "expression," as in *Johnson*, was Kennedy's "stock in trade," the commodity he sold to his employer for a salary, *id.* at 967 (internal quotation mark and alteration omitted), it is similarly non-dispositive of "the

---

**[8]** Two additional points warrant comment. First, contrary to Kennedy's assertions, the forum is relevant because the on-field location is a required component of Kennedy's speech, and one that is central to the message he conveys. Indeed, Kennedy insists that his sincerely held religious beliefs do not permit him to pray anywhere other than on the field where the game was just played. The accommodations he refused signal further temporal and circumstantial requirements concerning his speech (i.e., that it must be delivered immediately after the game, while in view of spectators). These features confirm that the relevant conduct—Kennedy's demonstrative speech to students and spectators— owes its existence to Kennedy's position with the District. Second, Kennedy's demonstrative message to students only carries instructive force due to his position as a coach. Surely, if an ordinary citizen walked onto the field and prayed on the fifty-yard line, the speech would not communicate the same message because the citizen would not be clothed with Kennedy's authority. *See Johnson*, 658 F.3d at 968; *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 340 (6th Cir. 2010).

question of whether [Kennedy] spoke as a citizen or as an employee" that the religious content of Kennedy's message was not part of his "curriculum," *id.* at 967 n.13. Coaches, like teachers, do not cease acting as coaches "each time the bell rings or the conversation moves beyond the narrow topic of curricular instruction." *Id.* at 967–68. In any event, Kennedy's prayer celebrates sportsmanship, so the content of Kennedy's speech arguably falls within Kennedy's curriculum. *See* ER 251 (job description requiring Kennedy to "exhibit sportsmanlike conduct at all times").

True, Kennedy spoke in contravention of his supervisor's orders, *see Dahlia*, 735 F.3d at 1075, but that lone consideration is not enough to transform employee speech into citizen speech. If it was, there would be no need for the *Garcetti* analysis because *every* First Amendment retaliation case in the employment context involves some degree of employer disagreement with the expressive conduct.

All told, by kneeling and praying on the fifty-yard line immediately after games, Kennedy was fulfilling his professional responsibility to communicate demonstratively to students and spectators. Yet, he "took advantage of his position to press his particular views upon the impressionable and captive minds before him." *Johnson*, 658 F.3d at 968 (internal quotation marks omitted). In addition, he "did not act as an ordinary citizen when 'espousing God as opposed to no God'" under the bright lights of the BHS football stadium. *Id.* at 967. Because his demonstrative speech fell within the scope of his typical job responsibilities, he spoke as a public employee, and the District was permitted to order Kennedy not to speak in the manner that he did. *See id.* at 967–70; *Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1213 (9th Cir. 1996) ("A

teacher appears to speak for the state when he or she teaches; therefore, the department may permissibly restrict such religious advocacy."); *Peloza*, 37 F.3d at 522 (permitting District to restrict biology teacher's ability "to discuss his religious beliefs with students during school time on school grounds").

Other circuits agree.   In *Borden*, the Third Circuit concluded that a coach spoke "pursuant to his official duties as a coach"—and thus as a public employee—when he bowed his head and took a knee with his team while they prayed in the locker room prior to football games.  523 F.3d at 171 n.13.   The coach "concede[d] that the silent acts of bowing his head and taking a knee [were] tools that he use[d] to teach his players respect and good moral character."  *Id.* at 172.   He therefore was fulfilling his responsibilities as a teacher, as Kennedy is here.

In *Evans-Marshall v. Board of Education*, 624 F.3d 332 (6th Cir. 2010), the Sixth Circuit explained that "[w]hen a teacher teaches, the school system . . . *hires* that speech." *Id.* at 340 (internal quotation mark omitted).  As a consequence, "it can surely regulate the content of what is or is not expressed," because a teacher is not "the employee *and* employer."  *Id.* (internal quotation marks omitted).  For example, "[w]hen Pickering sent a letter to the local newspaper criticizing the school board," the court noted, "he said something that any citizen has a right to say, and he did it on his own time and in his own name, not on the school's time or in its name."  *Id.*  By contrast, when a teacher teaches—as Kennedy did through the example of his own conduct while acting in his capacity as an assistant coach— "[he] d[oes] something [he] was hired (and paid) to do, something [he] could not have done but for the Board's decision to hire [him] as a public school teacher."  *Id.*

The Seventh Circuit employed the same reasoning in *Mayer v. Monroe County Community School Corporation*, 474 F.3d 477 (7th Cir. 2006). It found "that teachers hire out their own speech and must provide the service for which employers are willing to pay." *Id.* at 479. It thus held that a teacher spoke as an employee, not as a citizen, when she opined on the Iraq war at a "current-events session, conducted during class hours, [that] was part of her official duties." *Id.* Similarly, Kennedy spoke on the field, at a time when he was on call, and in a manner that was well within his job description. Like the teacher in *Mayer*, he therefore spoke as a public employee.

Finally, in *Doe v. Duncanville Independent School District*, 70 F.3d 402 (5th Cir. 1995), the Fifth Circuit barred school employees from participating in or supervising student-initiated prayers that took place after basketball practice. *Id.* at 406. It reasoned that "[t]he challenged prayers take place during school-controlled, curriculum-related activities that members of the basketball team are required to attend," and "[d]uring these activities[,] [District] coaches and other school employees are present as representatives of the school and their actions are representative of [District] policies." *Id.* Applying that reasoning, if a coach speaks as an employee by standing in the vicinity of student prayer and supervising the students immediately after a basketball practice, there can be little question that Kennedy spoke as an employee when he likewise performed a task that the District hired and paid him to perform: demonstrative communication with students and spectators immediately after football games.

### 3. *Kennedy's counterarguments are not convincing.*

Kennedy insists the district court invented "a bright-line temporal test that strips First Amendment protections from

'on the job' public employees." That is incorrect. The district court said "[t]here is no bright-line test . . . on this issue," and decided the second *Eng* factor by asking whether Kennedy spoke as a public employee or private citizen "under the totality of the circumstances." More importantly, the court did not articulate a temporal dichotomy that reserves First Amendment rights only for "off-duty" employees. To illustrate, Kennedy can pray in his office while he is on duty drawing up plays, pray non-demonstratively when on duty supervising students, or pray in "a private location within the school building, athletic facility, or press box" before and after games, as BHS offered. He can also write letters to a local newspaper while on duty as a coach, *see Pickering*, 391 U.S. at 572–74, or privately discuss politics or religion with his colleagues in the teacher's lounge, *see Rankin v. McPherson*, 483 U.S. 378, 388–92 (1987); *Tucker*, 97 F.3d at 1213. What he cannot do is claim the First Amendment's protections for private-citizen speech when he kneels and prays on the fifty-yard line immediately after games in school logoed-attire in view of students and parents. *Cf. Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 651–52 (9th Cir. 2006) (upholding a restriction prohibiting a government employee from discussing religion with his clients in his government cubicle in the course of providing them assistance, while explaining that the employee could still read his Bible "whenever he does not have a client with him in his cubicle").

Next, Kennedy observes that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Lane*, 134 S. Ct. at 2379. He argues that prayer—"the speech at issue"—did not "relate[] to" his job, and certainly did not

constitute "coaching."**[9]**  But again, where, as here, a teacher speaks at a school event in the presence of students in a capacity one might reasonably view as official, we have rejected the proposition that a teacher speaks as a citizen simply because the content of his speech veers beyond the topic of curricular instruction, and instead relates to religion. *Johnson*, 658 F.3d at 967–68; *see also Grossman*, 507 F.3d at 1100 ("The First Amendment is not a teacher license for uncontrolled expression at variance with established curricular content." (internal quotation marks omitted)); *Mayer*, 474 F.3d at 480 (concluding teacher spoke as employee even though she "had *not* been hired to buttonhole cosmetology students in the corridors and hand out tracts proclaiming that homosexuality is a mortal sin").  Kennedy also does not dispute that his demonstrative speech taught students about what he viewed as appropriate conduct.  Nor can he dispute that many players responded as if prayer were part of the school-sponsored curriculum—they prayed on the field only when Kennedy elected to do so.

Finally, Kennedy insists it is irrelevant that he had access to the field only by virtue of his position because *Lane* establishes that the critical question is whether his speech was within the ordinary scope of his duties.  For the reasons explained above, Kennedy's speech *was* within the ordinary scope of his duties.  In any event, Kennedy overlooks *Coomes*, which affirmed that if a plaintiff's speech "owes its

---

**[9]** Kennedy elsewhere acknowledges that whether a public employee speaks "as a citizen" does not turn on the content of the speech.  Kennedy may then be arguing that the *act* of praying itself is not related to his job. That argument fails because demonstratively speaking to students and spectators after games through the example set by his own conduct is within the scope of Kennedy's job responsibilities.

existence to [his] position as a teacher, then [he] spoke as a public employee, not as a citizen, and our inquiry is at an end."[10] 816 F.3d at 1260 (internal quotation marks and alterations omitted).

In sum, when Kennedy kneeled and prayed on the fifty-yard line immediately after games while in view of students and parents, he spoke as a public employee, not as a private citizen, and his speech therefore was constitutionally unprotected.[11]

## CONCLUSION

On Friday nights, many cities and towns across America temporarily shut down while communities gather to watch high school football games. Students and families from all walks of life join "to root for a common cause" and admire the young people who step proudly onto the field. *Santa Fe Ind. Sch. Dist. v. Doe*, 530 U.S. 290, 312 (2000). While we "recognize the important role that public worship plays in many communities, as well as the sincere desire to include public prayer as a part of [these] occasions," such activity can promote disunity along religious lines, and risks alienating valued community members from an environment

---

[10] We issued *Coomes* nearly two years after the Supreme Court issued *Lane*. Additionally, *Coomes* is more factually analogous than *Lane* because *Coomes* involved speech by a public-school official.

[11] We emphasize that our conclusion neither relies on, nor should be construed to establish, any bright-line rule. As our analysis demonstrates, the second *Eng* factor requires a practical, fact-intensive inquiry into the nature and scope of a plaintiff's job responsibilities. It also requires a careful examination of the precise speech at issue. We also continue to recognize that "speech by a public employee, even a teacher, does not always represent, or even appear to represent, the views of the state." *Tucker*, 97 F.3d at 1213.

that must be open and welcoming to all. *Id.* at 307. That is why the "preservation and transmission of religious beliefs and worship is a responsibility and a choice committed to the private sphere, which itself is promised freedom to pursue that mission." *Lee v. Weisman*, 505 U.S. 577, 589 (1992).

As for the task at hand, we hold that Kennedy spoke as a public employee when he kneeled and prayed on the fifty-yard line immediately after games while in view of students and parents. Kennedy therefore cannot show a likelihood of success on the merits of his First Amendment retaliation claim. We AFFIRM the district court's order denying Kennedy's motion for a preliminary injunction. Appellant shall bear costs on appeal. Fed. R. App. P. 39(a)(2).

M. SMITH, Circuit Judge, specially concurring:

I write separately to share my view that BSD's actions were also justified to avoid violating the Establishment Clause. Kennedy's claim therefore fails on the additional ground that the District can satisfy the fourth *Eng* factor. *See Eng v. Cooley*, 552 F.3d 1062, 1071–72 (9th Cir. 2009) (asking whether the state has an adequate justification for restricting the employee's speech). I also write to share a few thoughts about the role of the Establishment Clause in protecting the rights of all Americans to worship (or not worship) as they see fit.

## I.  Governing Law

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The Clause applies against the states, and therefore their public school systems, pursuant to the

Fourteenth Amendment. *See Wallace v. Jaffree*, 472 U.S. 38, 49–50 (1985). The Clause "mandates governmental neutrality between religion and religion, and between religion and nonreligion." *McCreary Cty., Ky. v. Am. Civil. Liberties Union of Ky.*, 545 U.S. 844, 860 (2005) (quoting *Epperson v. Ark.*, 393 U.S. 97, 104 (1968)) (internal quotation marks omitted). "The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Edwards v. Aguillard*, 482 U.S. 578, 583–84 (1987). In that setting, "[t]he State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure." *Id.* at 584. Accordingly, the Clause "proscribes public schools from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred." *Lee v. Weisman*, 505 U.S. 577, 604–05 (1992) (Blackmun, J., concurring) (internal quotation marks and emphasis omitted).

Under the fourth *Eng* factor, the District can escape potential liability if it can show that it had an adequate justification for treating Kennedy differently from other members of the general public. *Eng*, 552 F.3d at 1071–72. "[A] state interest in avoiding an Establishment Clause violation may be characterized as compelling, and therefore may justify content-based discrimination." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112 (2001) (internal quotation marks omitted); *see also Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 522 (9th Cir. 1994) ("The

school district's interest in avoiding an Establishment Clause violation trumps [a teacher's] right to free speech.").[1]

*Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000), describes the framework for assessing whether BSD would be liable for an Establishment Clause violation if Kennedy were to resume kneeling and praying on the fifty-yard line immediately after games in the presence of students and spectators. *See id.* at 315 (asking whether the "continuation of" prayer at school event would violate the Establishment Clause).

In *Santa Fe*, the plaintiffs challenged a school district policy that permitted, but did not require, a student to deliver a prayer over the public address system before each varsity football game. *Id.* at 294. The "Prayer at Football Games" policy "authorized two student elections, the first to determine whether 'invocations' should be delivered, and the second to select the spokesperson to deliver them." *Id.* at 297 (internal quotation marks omitted). After the students had voted in favor of prayer and selected a speaker, the school district implemented two changes. It omitted the

---

[1] The parties disagree as to whether the District must show an *actual* Establishment Clause violation, *see Good News*, 533 U.S. at 112–13, or merely a legitimate interest in avoiding an Establishment Clause violation, *see Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) (noting the Court's suggestion in a prior case that "the interest of the State in avoiding an Establishment Clause violation may be a compelling one justifying an abridgement of free speech otherwise protected by the First Amendment." (internal quotation marks and alteration omitted)); *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 651 (9th Cir. 2006) (holding that the government's "need to avoid possible violations of the Establishment Clause" justified a restriction on employee speech). I do not reach this issue because a resumption of Kennedy's conduct would clearly result in an actual Establishment Clause violation.

word "prayer" from the title and amended the policy to refer to "'messages' and 'statements' as well as 'invocations.'" *Id.* at 298 (internal quotation marks omitted).

To assess whether the amended policy violated the Establishment Clause, the Court asked whether an objective student observer who was familiar with the history and context of the school's conduct would perceive that "prayer is, in actuality, encouraged by the school." *Id.* at 308.  Put differently, the relevant question was "whether an objective observer, acquainted with the text, legislative history, and implementation of the [policy], would perceive it as a state *endorsement* of prayer in public schools." *Id.* (emphasis added) (internal quotation marks omitted).  Applying that rule, the Court held that "an objective Santa Fe High School student w[ould] unquestionably perceive the inevitable pregame prayer as stamped with her school's seal of approval." *Id.*

The Court first considered the setting.  The prayer would be "delivered to a large audience assembled as part of a regularly scheduled, school-sponsored function conducted on school property." *Id.* at 307.  The message would also be "broadcast over the school's public address system," which was "subject to the control of school officials." *Id.*  The pregame ceremony would be "clothed in the traditional indicia of school sporting events, which generally include not just the team, but also cheerleaders and band members dressed in uniforms sporting the school name and mascot." *Id.* at 308.  Further, the school's name would be emblazoned on the field and the crowd would be "waving signs displaying the school name." *Id.*  The upshot, said the Court, was that an objective audience member would perceive the pregame prayer as a public expression "delivered with the approval of the school administration." *Id.*

The text and purpose of the policy reinforced that conclusion. The express purpose of the pregame message was to "solemnize the event." *Id.* at 306. Yet tellingly, the only message type the text endorsed was an "invocation," and "in the past at Santa Fe High School, an 'invocation' ha[d] always entailed a focused religious message." *Id.* at 306–07 (internal quotation marks omitted). The Court also noted that the school regulated the content of the message. Among other things, the message had to "establish the appropriate environment for competition." *Id.* at 306 (internal quotation marks omitted). The school also required that the pregame message "promote good sportsmanship." *Id.*

The history and context of the policy bolstered the conclusion that an objective observer would perceive the school to be encouraging prayer. The school had a "long-established tradition of sanctioning student-led prayer at varsity football games," *id.* at 315, and the policy itself had evolved from the "office of 'Student Chaplain' to the candidly titled 'Prayer at Football Games' regulation," *id.* at 309. The Court noted that the prayers were possible only because the school board had *chosen* to give the students the opportunity to deliver pregame messages. *Id.* With that context, the Court said it was "reasonable to infer that the specific purpose of the policy was to preserve a popular state-sponsored religious practice." *Id.* (internal quotation marks omitted).

Lastly, the Court was "persuaded that the delivery of a pregame prayer has the improper effect of coercing those present to participate in an act of religious worship." *Id.* at 312. According to the Court, some nonadherents were likely *required* to attend the games, "such as cheerleaders, members of the band, and, of course, the team members

themselves." *Id.* at 311. Even those who were not so required would "feel immense social pressure," the Court said, "to be involved in the extracurricular event that is American high school football." *Id.* (internal quotation marks omitted). So, by allowing the prayer to be delivered, the district was impermissibly forcing students to choose "between attending these games and avoiding [a potentially] personally offensive religious ritual[]." *Id.* at 312.

Mindful of the totality of these circumstances, the Court concluded that "the realities of the situation plainly reveal that [the district's] policy involves both perceived and actual endorsement of religion." *Id.* at 305. It therefore violated the Establishment Clause. *Id.* at 316.

## II. Application

Here, an objective BHS student familiar with the history and context of Kennedy's conduct would perceive his practice of kneeling and praying on the fifty-yard line immediately after games in view of students and spectators as District endorsement of religion or encouragement of prayer. The District therefore justifiably restricted Kennedy's speech to avoid violating the Establishment Clause.

### A. The setting, context, and history support the perception that Kennedy's conduct would be viewed as state endorsement of religion.

The setting supports this conclusion. If Kennedy's practice were to resume, an objective student would observe a public-school employee in BHS-logoed attire demonstratively praying in front of "a large audience assembled as part of a regularly scheduled, school-sponsored function conducted on school property." *Id.* at 307. Based

on previous experience, Kennedy's players would likely join him, meaning he would likely be surrounded by a majority of the team. The speech would also occur at the most prominent location on the field during a time when Kennedy is responsible for supervising players. Lastly, the scene would likely exhibit "the traditional indicia of school sporting events," including "cheerleaders and band members dressed in uniforms," an audience "waving signs displaying the school name," and the school's name or initials "written in large print across the field and on banners and flags." *Id.* at 308.

The context would bolster the perception that the District was endorsing religion. An objective observer would know that Kennedy had access to the field only by virtue of his position as a coach, that a Satanist group had been denied such access, and that Kennedy insists on demonstratively praying only while in view of students and spectators. True, in contrast to *Santa Fe*, the District would not be authorizing or regulating the content of Kennedy's prayers. *See* 530 U.S. at 306–07. Still, an objective observer would know that it is Kennedy's professional duty to communicate demonstratively to students and spectators after games, and that use of the field, like use of the public address system, is "subject to the control of school officials." *Id.* at 307.

The relevant history would add to the perception that the District encourages prayer. An objective observer would know that during the previous eight years, Kennedy led and participated in locker-room prayers, regularly prayed on the fifty-yard line, and eventually led a larger spiritual exercise at midfield after each game. BSD states that it was not aware of this conduct until 2015, but if Kennedy were to resume his practice of praying at midfield, an objective student could reasonably infer that the District was ratifying the religious

exercises that Kennedy had previously conducted. This inference would follow because the District would be acquiescing to Kennedy's conduct knowing full well that the players prayed only when Kennedy elected to do so, and that the previous practice started as an individual prayer but evolved into an orchestrated session of faith.[2]

Lastly, by permitting Kennedy's conduct, the District would be condoning the same coercion identified in *Santa Fe*. As was true in that case, various students would be required to attend the games, "such as cheerleaders, members of the band, and, of course, the team members themselves." *Id.* at 311. They would see an important District representative display "the distinctively Christian prayer form"[3] in the most prominent location on the field,

---

[2] Again, perhaps bolstering this inference, an objective observer would likely see Kennedy surrounded by his players. An objective observer familiar with the relevant history would also know that the football team had engaged in pre- and post-game prayers "as a matter of school tradition," and that both activities apparently "predated" Kennedy's involvement with the football program. With that context, an objective observer might reasonably perceive that the District had changed its mind regarding the propriety of Kennedy's conduct. This is particularly so because BSD had previously stated in a letter to the Bremerton community that it could not permit Kennedy's conduct lest it be considered to be endorsing religion.

[3] Amici note that Kennedy employed "the distinctively Christian prayer form of kneeling with hands clasped and head bowed—a pose with deep historical significance and symbolic meaning within Christianity." Br. of Americans United for Separation of Church and State et al. as Amici Curiae Supporting Appellee at 12. By contrast, Jews "do not typically kneel," and instead "stand for prayer and often sway." *Id.* at 13. For Muslims, "the typical prayer posture is prostration, though prayer also involves standing and bowing." *Id.* Prayer in the Bahá'í faith "involves kneeling, bowing, and prostration." *Id.* Hindus and Buddhists "pray in the seated, cross-legged lotus position." *Id.* Finally, it is worth

despite the community's religious diversity.  This act would "send[] the ancillary message to members of the audience who are nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community."  *Id.* at 309–10 (internal quotation marks omitted).  Kennedy might not "*intentionally* involve students in his on-duty religious activities," (emphasis added), but I have no reason to believe that the pressure emanating from his position of authority would dissipate.  Accordingly, many students would feel pressure to join Kennedy's religious activity to avoid marking themselves as outsiders or alienating themselves from the team.  The record suggests that this is precisely what occurred when Kennedy first started praying on the field in 2008.  *See* Kennedy Decl. at 3 ("Over time, the number of players who gathered near me after the game grew to include the majority of the team.").  Yet the Constitution forbids Kennedy from forcing students whose beliefs are not the same as his to compromise their personal beliefs or identify themselves as religious dissenters.

In sum, if Kennedy were to resume kneeling and praying on the fifty-yard line immediately after games while in view of students and spectators, an objective student observer would see an influential supervisor do something no ordinary citizen could do—perform a Christian religious act on secured school property while surrounded by players—simply because he is a coach.  Irrespective of the District's views on that matter, a reasonable observer would conclude in light of the history and context surrounding Kennedy's

---

noting that the Bremerton community includes individuals who identify as atheist or as agnostic.  *Id.* at 14.

conduct that the District, "in actuality," favors religion, and prefers Christianity in particular.[4]  *Santa Fe*, 530 U.S. at 308.

## B. Kennedy's counterarguments are not persuasive.

Kennedy contends that an objective observer would "conclude (at most) that he is engaged in a personal moment of silence" because students would not be directly coerced to pray, the District would not be regulating the content of his religious expression, and the prayer would not be the product of a school policy, in contrast to the prayer at issue in *Santa Fe*.  These observations may be correct, but they have little significance when considered within the totality of the circumstances.  Indeed, they are rebutted by the evidence of indirect coercion, and the fact that an objective observer familiar with the context would know it is Kennedy's professional duty to communicate demonstratively to students and spectators after games.

Next, Kennedy insists that kneeling and praying on the fifty-yard line would not be viewed as state endorsement of religion because a coach's expressive conduct around a playing field is quintessential personal speech.  Kennedy notes that some athletes point to the heavens after a

---

[4] *Borden v. Sch. Dist. of Tp. of E. Brunswick*, 523 F.3d 153 (3rd Cir. 2008), supports this conclusion.  There, the Third Circuit held that a football coach impermissibly endorsed religion by bowing his head and taking a knee while his players engaged in prayer.  *Id.* at 174.  Like Kennedy, the coach had a history of leading team prayers, yet stated that he wanted to bow and kneel only to show respect to his team.  *Id.* at 177. The court concluded that the history gave rise "to a reasonable inference that [the coach's] requested conduct is meant to preserve a popular state-sponsored religious practice of praying with his team."  *Id.* (internal quotation marks omitted).  In light of Kennedy's history, an objective observer could draw the same inference here, notwithstanding Kennedy's statement that he seeks only to pray silently and alone.

touchdown, or kneel when a player is being treated for an injury, yet fans do not generally view either of those actions as having been made on behalf of the team. Even if that is true, it says little about the speech at issue here, and it ignores entirely the relevant history and context surrounding Kennedy's speech. *See Santa Fe*, 530 U.S. at 315 (holding courts may not "turn a blind eye to the context in which [the conduct] arose").

Lastly, Kennedy contends that the remedy for any inference of endorsement "is to educate the audience rather than squelch the speaker." *Hills v. Scottsdale Unified Sch. Dist. No. 48*, 329 F.3d 1044, 1055 (9th Cir. 2003) (quoting *Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1299–1300 (7th Cir. 1993)). However, we have held that a disclaimer is not sufficient to alleviate Establishment Clause concerns in the graduation speech context, *Lassonde v. Pleasanton Unified Sch. Dist.*, 320 F.3d 979, 984 (9th Cir. 2003), and it is similarly unlikely that a disclaimer would cure the perception of endorsement at issue here. Once again, an objective student observer would still see a respected District employee do something no ordinary citizen could do—perform a distinctively Christian religious act on a secured portion of school property while supervising students—simply because he is a BHS football coach. Moreover, because Kennedy's speech would occur in the course of his ordinary responsibilities and he would be speaking in his capacity as a public employee, his conduct would be attributed to the District, thus diluting the effect of any potential disclaimer. *See Borden*, 523 F.3d at 177 n.20 ("As an employee of the School District as both a coach and tenured teacher, Borden's actions can be imputed to the School District. For this reason, Borden's claim that the School District could remove any Establishment Clause violation by writing a disclaimer saying that Borden's

speech does not represent the ideals of the School District is simply wrong."); *Doe v. Duncanville Ind. Sch. Dist.*, 70 F.3d 402, 406 (5th Cir. 1995) (stating that during school-sponsored sporting events coaches "are present as representatives of the school and their actions are representative of [school district] policies").[5]

In sum, the District can satisfy the fourth *Eng* factor. It justifiably restricted Kennedy's speech to avoid violating the Establishment Clause. An objective BHS student familiar with the relevant history and context would perceive Kennedy's conduct to reflect school endorsement of religion, encouragement of prayer, and a preference for one particular faith.[6]

---

[5] I nonetheless emphasize that schools should not simply "throw up their hands because of the possible misconceptions about endorsement of religion." *Hills*, 329 F.3d at 1055. Instead, they should endeavor "to teach [students] about the first amendment, about the difference between private and public action, [and] about why we tolerate divergent views," as BSD's letter to the Bremerton community admirably sought to do here. *Id.* (first alteration in original) (quoting *Hedges*, 9 F.3d at 1299). "Free speech, free exercise, and the ban on establishment are quite compatible when the government remains neutral and educates the public about the reasons." *Id.* (quoting *Hedges*, 9 F.3d at 1300). However, in this instance, BSD would not be remaining neutral in the eyes of an objective observer if it were to permit Kennedy to resume his on-field prayers.

[6] The District also contends that Kennedy's conduct fails the so-called "coercion" test and the three-prong framework from *Lemon v. Kurtzman*, 403 U.S. 602 (1971). I do not address those arguments in light of the analysis outlined above.

**III.    Averting    state    establishment    of    religion    ultimately safeguards religious liberty.**

Some readers may find this conclusion disconcerting. The record reflects, after all, that Coach Kennedy cared deeply about his students, and that his conduct was well-intentioned and flowed from his sincerely-held religious beliefs. Given those factors, it is worth pausing to remember that the Establishment Clause is designed to *advance* and *protect* religious liberty, not to injure those who have religious faith. Indeed, history has taught us "that one of the greatest dangers to the freedom of the individual to worship in his own way lay[s] in the Government's placing its official stamp of approval upon one particular kind of prayer or one particular form of religious services." *Engel v. Vitale*, 370 U.S. 421, 429 (1962).

It is a lamentable fact of human history that whenever a religious majority controls the government, it frequently uses the civil power to persecute religious minorities and non-believers.[7] The Founders who met in Philadelphia to negotiate the terms of the U.S. Constitution, and the men who later met in ratifying conventions in the several states, were well aware that many hundreds of thousands of people had lost their lives, been tortured, or had otherwise been deprived of their civil rights by governments in the control of some religious faith, during the then recent European wars of religion. These cataclysmic events led writers such as

---

[7] Interested readers might find Will (and later Will and Ariel) Durant's epic series on the history of civilization, with separate volumes entitled The Age of Faith, The Renaissance, The Reformation, The Age of Reason Begins, The Age of Louis XIV, The Age of Voltaire, and Rousseau and Revolution, amongst others, an excellent source to learn more about this subject. *See* WILL DURANT & ARIEL DURANT, THE STORY OF CIVILIZATION (MJF Books 1993).

Thomas Hobbes (1588–1679) and John Locke (1632–1704), each of whom was familiar to the Founders, to argue that state coercion is an inappropriate and ineffective tool for enforcing religious conformity, since religious belief must be sincerely held to be truly efficacious.

In some ways, the United States is a nation whose very existence is due to religious conflict because most of the colonies were initially settled by persons who came here to escape religious persecution in Europe.  When such colonists came, they generally settled amongst those who held similar religious beliefs, and the dominant religious group controlled the civil government, just as had been the case in Europe.  Thus, Anglicans initially dominated in Virginia, Puritans in Massachusetts, Quakers in Pennsylvania, Baptists in Rhode Island, and Roman Catholics in Maryland. But when, for example, the Puritan leaders of the Massachusetts Bay Colony were challenged by religious dissenters, such as Roger Williams and Anne Hutchinson, the dissidents were banished from, and persecuted by, the Colony over disagreements concerning theology, as were Catholics and non-Puritans generally.   Violence was frequently employed in many of the colonies to suppress religious dissenters.

Seeking to make America a more true refuge from religious persecution, some early leaders began to advocate for the disentanglement of religion and government.  For example, in responding to a bill introduced by Patrick Henry calling for state support for "Teachers of the Christian Religion," future president James Madison penned an essay arguing that Virginia should not financially support Christian instruction.  *See* James Madison, Memorial and Remonstrance Against Religious Assessments (June 20, 1785), in 5 THE FOUNDERS' CONSTITUTION 82 (P. Kurland

& R. Lerner eds. 1986). Madison asked rhetorically: "Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects?" *Id.* He also observed that Henry's bill was "a departure from that generous policy, which, offering an Asylum to the persecuted and oppressed of every Nation and Religion, promised a lustre to our country." *Id.* at 83.

After Henry's bill was defeated, the Virginia legislature eventually took up Thomas Jefferson's plan for the separation of church and state. In 1786, the Virginia Bill for Establishing Religious Freedom was adopted. Among other things, that Bill provided:

> We the General Assembly of *Virginia* do enact, that no man shall be compelled to frequent or support any relig[i]ous Worship place or Ministry whatsoever, nor shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief, but that all men shall be free to profess, and by argument to maintain their opinions in matters of religion, and that the same shall in no wise diminish, enlarge, or affect their civil capacities.

*Id.* at 77. Jefferson wrote that the law was "meant to comprehend, within the mantle of its protection, the Jew and the Gentile, the Christian and Mahometan, the Hindoo, and Infidel of every denomination." Thomas Jefferson, Autobiography (1821), in 5 THE FOUNDERS' CONSTITUTION, at 85.

Madison endeavored to make Jefferson's vision a part of the Constitution.  For example, Article VI of the Constitution requires that all federal officials "shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." U.S. Const. art. VI, cl. 3.  Later, what became the First Amendment to the Constitution included the words: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." *Id.* amend. I.  The purpose of these clauses is to protect our freedom of worship unhindered by the government.

This very brief glimpse of one aspect of our history is intended to show that, having learned from the harmful effects of past religious conflicts, our nation's Founders included in our foundational law safeguards against religious oppression by a government (or arms of that government) under the control of a religious majority that would punish or severely limit our right to worship (or not worship) as we please.  This is a priceless bulwark of our personal freedom, and I hope that interested readers will come to appreciate the Establishment Clause as a good friend and protector, and not as an enemy, of one of their most precious rights and liberties.

## IV.    Conclusion

Striking an appropriate balance between ensuring the right to free speech and avoiding the endorsement of a state religion has never been easy.  Thankfully, we no longer resolve these conflicts with violence, but instead use courts of law, where parties make arguments in free and open hearings to address their differences.  To that end, I commend the lawyers in these proceedings for the exceptional job they have done.

At the end of the day, I believe that a resumption of Kennedy's conduct would violate the Establishment Clause. I would therefore deny the preliminary injunction on the additional ground that BSD can satisfy the fourth *Eng* factor.