In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-13-00251-CV

_____

**KOUNTZE INDEPENDENT SCHOOL DISTRICT, Appellant**

**V.**

**COTI MATTHEWS, ON BEHALF OF HER MINOR CHILD MACY MATTHEWS, ET AL, Appellees**

**On Appeal from the 356th District Court**
**Hardin County, Texas**
**Trial Cause No. 53526**

**MEMORANDUM OPINION**

This appeal is before us on remand from the Texas Supreme Court. *See Kountze Indep. Sch. Dist. v. Matthews*, 482 S.W.3d 120 (Tex. App.—Beaumont 2014), *rev'd and remanded*, 484 S.W.3d 416 (Tex. 2016). This is an interlocutory appeal from the trial court's denial of Kountze Independent School District's ("Kountze ISD") plea to the jurisdiction.

1

The facts of this case were set forth extensively in this Court's previous opinion. *See Kountze Indep. Sch. Dist.*, 482 S.W.3d at 124–26. Therefore, we recite only those facts relevant to the resolution of the issues presently before us. The Appellees, consisting of parents of certain cheerleaders from Kountze High School, on behalf of the cheerleader students ("Cheerleaders"), brought suit against Kountze ISD and its former superintendent, Kevin Weldon, after Weldon issued a decree that prohibited the Cheerleaders from including religious messages on run-through banners used at the beginning of high school football games.[1] After a combined hearing on multiple motions, including Kountze ISD's plea to the jurisdiction, Kountze ISD's motion for summary judgment on its request for declaratory relief, and the Cheerleaders' motion for partial summary judgment, the trial court issued a partial summary judgment order on May 8, 2013. In the order, the trial court granted, in part, Cheerleaders' motion for partial summary judgment,

---

[1] For example, during the 2012 homecoming pregame ceremony, the Cheerleaders displayed a banner proclaiming, "I can do all things through CHRIST which strengthens me." The "T" in "CHRIST" was painted to resemble a wooden cross, and the biblical citation, "Phil. 4:13," was noted beneath the scriptural quote. Another week, the official run-through banner declared, "But thanks be to God, which gives us victory through our Lord Jesus Christ," and featured a citation to the Bible verse, "I Cor. 15:57." In early October 2012, one run-through banner urged, "Let us RUN with Endurance the race GOD has set Before US." The banner, which also cited the source for the quotation, "Hebrews 12:1," was painted in the school colors of red, white, and black. "A lion which is strongest among beast & turneth not away for any. Proverbs 30:30."

thereby implicitly denying Kountze ISD's plea to the jurisdiction. *See Thomas v. Long*, 207 S.W.3d 334, 340 (Tex. 2006) (noting that by ruling on the merits of the plaintiff's claims, the trial court assumed jurisdiction and necessarily implicitly denied the defendant's jurisdictional challenge, providing the appellate court jurisdiction for interlocutory appeal.).

## Jurisdiction

Kountze ISD appealed the trial court's denial of its plea to the jurisdiction. Generally, an appeal may only be taken from a final judgment. *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001). When there has been no conventional trial on the merits, an order or judgment is not final for purposes of appeal unless it actually disposes of every pending claim and party or clearly and unequivocally states that it finally disposes of all claims and parties. *Id.* at 205. Appellate courts have authority to review interlocutory orders only when authorized by statute. *Bally Total Fitness Corp. v. Jackson*, 53 S.W.3d 352, 352 (Tex. 2001). Section 51.014 of the Civil Practice and Remedies Code allows an appeal from an interlocutory order that "grants or denies a plea to the jurisdiction by a governmental unit as that term is defined in Section 101.001[.]" Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8) (West Supp. 2016). Kountze ISD is a governmental unit under section 101.001. *See id.* § 101.001(3)(B) (West Supp.

3

2016). Therefore, we have jurisdiction to consider the interlocutory appeal of the trial court's implicit denial of the plea to the jurisdiction. *See id.* § 51.014(a)(8).[2]

**Standard of Review**

A plea to the jurisdiction is a dilatory plea that challenges a trial court's authority to decide a case on the merits. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). To have authority to resolve a case, a court must have subject matter jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). Sovereign and governmental immunity from suit deprive a trial court of subject matter jurisdiction. *Reata Const. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006). In a suit against a governmental entity, the plaintiff must prove a valid waiver of immunity from suit and must plead sufficient facts to affirmatively demonstrate the court's jurisdiction in order to invoke the court's subject matter jurisdiction over the claim. *Tex. Dep't of Parks & Wildlife v.*

---

[2] We have no jurisdiction to consider the partial summary judgment as such is not a final order. *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001). Kountze ISD contends in its brief that "[t]he order denied all relief sought by the parties except for the relief specifically granted by the order and the relief of attorneys' fees. By signing the order, *the* [*Cheerleaders*] *agreed to dismissal of all their claims*, except those included in the trial court's summary judgment order." However, the partial summary judgment does not dismiss all other claims or otherwise dispose of every pending claim and party or clearly and unequivocally state that it finally disposes of all claims and parties. *See id.* at 205. Instead, the order simply denies summary judgment for all claims before it and not expressly granted in the order.

*Miranda*, 133 S.W.3d 217, 226 (Tex. 2004); *Tex. Ass'n of Bus.*, 852 S.W.2d at 446. Whether the trial court has subject matter jurisdiction is a question of law that we review under a *de novo* standard, construing the pleadings liberally in plaintiff's favor and accept the pleadings' factual allegations as true. *Miranda,* 133 S.W.3d at 226; *Tex. Nat. Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 855 (Tex. 2002). The reviewing court does not examine the merits of the cause of action when considering a trial court's ruling on a plea to the jurisdiction, but considers only the plaintiff's pleadings and any evidence relevant to the jurisdictional inquiry. *Cty. of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002).

In order to overcome the school district's entitlement to governmental immunity, the Cheerleaders are required to allege facts that affirmatively demonstrate the trial court's jurisdiction. *See Tex. Ass'n of Bus.*, 852 S.W.2d at 446.

**Analysis**

"It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). This often quoted sentence from one of the most important Supreme Court cases in history protecting the constitutional rights of students conveys that schools are not

5

institutions immune from constitutional scrutiny: students retain their constitutional freedoms even when they cross the threshold into the school. At the same time, the Court has also held that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings[,]" *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). The rights of students "must be 'applied in light of the special characteristics of the school environment.'" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quoting *Tinker*, 393 U.S. at 506).

The central disagreement between the Cheerleaders and Kountze ISD has revolved around the question of whether the Cheerleaders' run-through banners are, for purposes of free speech law, "government speech" as maintained by the school district, or "private speech" as claimed by the Cheerleaders. Kountze ISD contends there is no waiver of governmental immunity as to the Cheerleaders' free speech claims because they have not established that the banners are private speech, and thus, the trial court erred by denying the plea to the jurisdiction. We will address the issue concerning whether the speech is government speech or private speech, as the resolution of that issue controls the question of governmental immunity in this matter.

Government speech is "not subject to scrutiny under the Free Speech Clause." *Pleasant Grove City v. Summum*, 555 U.S. 460, 464 (2009). That is, the government may restrict its own speech, which includes speech expressed by others under government control, without implicating the Free Speech Clause. *Id.* at 467–68. The "government speech doctrine" is justified at its core by the idea that, in order to function, government must have the ability to express certain points of view, including control over that expression. *See*, *e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in the judgment) ("It is the very business of government to favor and disfavor points of view . . . ."). The doctrine gives the government an absolute defense to an individual's free-speech claim. Thus, if the Cheerleaders' speech as painted on the run-through banners is pure government speech, the Cheerleaders could not prove a valid waiver of immunity from suit in order to invoke the court's subject matter jurisdiction over their claim. *See Miranda*, 133 S.W.3d at 226. Private speech, on the other hand, is generally subject to constitutional protections of free speech, save and except for certain enumerated types of forbidden speech not applicable here, and governmental immunity has been waived for such claims.

## Applicable Law

The Cheerleaders clearly alleged in their petition that, among other things, the "Defendants deprived and continue to deprive [them] of their rights to free speech[.]" They also sought "a declaration from the Court . . . that the conduct and actions of Defendants as described violate state law, to include the Texas Constitution[.]" The Texas Constitution provides: "Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press." Tex. Const. art. I, § 8. The U.S. Supreme Court has held that "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students." *Tinker*, 393 U.S. at 506. The Cheerleaders offer no arguments based on the text, history, or purpose of section 8 that it provides them any greater protection in this context than that provided by the First Amendment of the U.S. Constitution. As such, we may rely upon persuasive authorities applying free speech protections under both the federal and Texas constitutions. *See In re Commitment of Fisher*, 164 S.W.3d 637, 645 (Tex. 2005) ("Where, as here, the parties have not argued that differences in state and federal constitutional guarantees are material to the case, and none is apparent, we limit our analysis to the United States Constitution and assume that its concerns

8

are congruent with those of the Texas Constitution."); *Tex. Dep't of Transp. v. Barber*, 111 S.W.3d 86, 106 (Tex. 2003); *Davenport v. Garcia*, 834 S.W.2d 4, 40 (Tex. 1992) (Hecht, J., concurring) ("When state and federal provisions overlap or correspond, state law, as well as federal law and the law of other states, may be helpful in analyzing their proper application.").

## Characterization of Cheerleaders' Speech

The Fifth Circuit has explained that

> [w]hen educators encounter student religious speech in schools, they must balance broad constitutional imperatives from three areas of First Amendment jurisprudence: the Supreme Court's school-speech precedents, the general prohibition on viewpoint discrimination, and the murky waters of the Establishment Clause. They must maintain the delicate constitutional balance between students' free-speech rights and the Establishment Clause imperative to avoid endorsing religion.

*Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011). This body of law has been described by other courts as "complicated." *See*, *e.g*., *id*. at 382. We thus evaluate student speech claims "'in light of the special characteristics of the school environment,'" beginning by categorizing the student speech at issue. *Morse v. Frederick*, 551 U.S. 393, 394 (2007) (quoting *Tinker*, 393 U.S. at 506). For

9

resolution of this interlocutory appeal, we need only look to the Supreme Court's general school-speech precedents.[3]

In school speech cases, there are "three recognized categories of speech: government speech, private speech, and school-sponsored speech." *Pounds v. Katy Indep. Sch. Dist.*, 730 F.Supp.2d 636, 642 (S.D. Tex. 2010). Kountze ISD argues that the banners are "government speech," that is, speech of individuals acting in their official capacity as representatives of the school, and thus, constitutional free speech protections are not implicated and none of the cheerleaders individually, nor the group as a whole, has a constitutional right to control the content of the banners.

## A. Government Speech

In determining whether speech is the government's, the "key inquiry is the 'degree of governmental control over the message.' Speech constitutes government speech when it is 'effectively controlled' by the government." *Pelts & Skins, LLC v. Landreneau*, 448 F.3d 743, 743 (5th Cir. 2006) (quoting *Johanns v. Livestock Mktg., Assoc.*, 544 U.S. 550, 560–61 (2005)). The quintessential example of pure

---

[3] Neither party has raised any issue concerning the Establishment Clause, and viewpoint discrimination precedents are not dispositive of this appeal and become relevant only if we determine that the trial court may exercise subject matter jurisdiction of these claims. Therefore, we limit our discussion to categorizing the student speech at issue.

government speech in the school setting is a principal speaking at a school assembly. *Fleming v. Jefferson Cty. Sch. Dist.*, 298 F.3d 918, 923 (10th Cir. 2002).

Kountze ISD relies primarily upon the Supreme Court cases of *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) and *Garcetti v. Ceballos*, 547 U.S. 410 (2006) to support its contention that the run-through banners displayed at varsity football games are government speech.[4] In *Summum*, the Supreme Court held that Pleasant Grove City, Utah ("the City") had not violated the First Amendment free speech rights of Summum, a religious organization, when the City refused to erect a permanent monument that Summum had tried to donate and place in a public park. *Summum*, 555 U.S. at 481. The Court held there was no First Amendment violation because "the City's decision to accept certain privately donated monuments while rejecting [Summum's] is best viewed as a form of government speech." *Id.* The Supreme Court noted that the City "'effectively controlled' the messages sent by the monuments in the Park by exercising 'final

---

[4] Kountze ISD cites *Doe v. Silsbee Indep. Sch. Dist.*, 402 Fed. Appx. 852, 855 (5th Cir. 2010), cert, denied, 131 S. Ct. 2875 (2011) for its assertion that the cheerleaders are representing and acting on behalf of the school when they engage in their cheerleading activities, arguing that "[a]s the Fifth Circuit held in a case out of nearby Silsbee ISD, cheerleaders do not have free speech rights over when or how they participate in cheerleading activities because they serve 'as a mouthpiece' for the school." The Federal Appendix covers opinions and decisions from 2001 to date issued by the U.S. courts of appeals that are not selected for publication in the Federal Reporter. These unpublished opinions are not binding precedent, although they may be cited as authority. *See* Fed. R. App. Pro. 32.1.

approval authority' over their selection." *Id*. at 473 (quoting *Johanns*, 544 U.S. at 560–61). The Court explained that governments have historically used monuments, such as statutes, triumphal arches, and columns, "to speak to the public." *Id*. at 470. These "[p]ermanent monuments displayed on public property typically represent government speech." *Id*. The Court also recognized that public parks are a traditional public forum. *Id*. at 469. "Public parks are often closely identified in the public mind with the government unit that owns the land." *Id*. at 472. Thus, given the context, there was "little chance that observers [would] fail to appreciate" that the government was the speaker. *Id*. at 471.

Like *Summum*, *Johanns v. Livestock Marketing Ass'n*, is another often cited decision wherein the Supreme Court has most clearly formulated the government speech doctrine. In *Johanns*, the Supreme Court held that a promotional campaign to encourage beef consumption that the government "effectively controlled" was government speech. 544 U.S. at 560. The government did not pay for the campaign itself; instead, it funded the campaign by charging an assessment on all sales of cattle and imported beef products. *Id*. at 554. The government, though, had "set out the overarching message and some of its elements" and had "final approval authority over every word used in every promotional campaign." *Id*. at 561. Thus, because the message in the promotional campaign was "from beginning to end the

12

message established by the Federal Government," the campaign was categorized as government speech. *Id*. at 560.

*Garcetti v. Ceballos* instructs that, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. The critical question identified in *Garcetti* was whether the speech at issue was itself ordinarily within the scope of the employee's duties, not whether it merely concerned those duties. *Id*. at 423–24. If so, the public employee's speech is not entitled to constitutional protection. *Id*.

*Garcetti* was used recently to affirm a school district's decision not to renew the contract of a beloved high school football coach who, following the end of each football game, would silently take a knee at mid-field and say a short, silent prayer. *Kennedy v. Bremerton Sch. Dist*., No. 16-35801, 2017 U.S. App. LEXIS 16106 (9th Cir., Aug. 23, 2017). Despite the fact that the game was over, that he was not exercising authority over any student-athlete, and that he had no specific, assigned task at the time of his prayer, the Ninth Circuit held that the coach's speech was part of his "job responsibilities." *Id*. at *29–34. Thus, his speech was not entitled to constitutional protection. *Id*. at *42–43. The Court held that the coach spoke as a public employee, not as a private citizen when he kneeled and prayed on the fifty-

13

yard line immediately after games in school-logoed attire while in view of students and parents—that he had a professional responsibility to communicate demonstratively to students and spectators and "he 'took advantage of his position to press his particular views upon the impressionable and captive minds before him.'" *Id.* at \*36–37, 40–41 (quoting *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 968 (9th Cir. 2011)). The panel held that because plaintiff's demonstrative speech fell within the scope of his typical job responsibilities, he spoke as a public employee, and the district was permitted to order him not to speak in the manner that he did. *Id.* at \*37.

In the most recent case dealing with the issue of government speech, the Supreme Court held that the messages on Texas specialty license plates are government speech and, using the same analysis as in *Summum*, cited three key factors from that opinion. *See Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S.Ct. 2239 (2015). First, license plates have long been used by the States to convey state messages. *Id.* at 2248. Second, license plates "are often closely identified in the public mind" with the State, since they are manufactured and owned by the State, generally designed by the State, and serve as a form of "government ID." *Id.* (internal quotation marks omitted). Third, Texas

14

"maintain[ed] direct control over the messages conveyed on its specialty plates."

*Id*. at 2249. The Court explained that

> a person who displays a message on a Texas license plate likely intends to convey to the public that the State has endorsed that message. If not, the individual could simply display the message in question in larger letters on a bumper sticker right next to the plate. But the individual prefers a license plate design to the purely private speech expressed through bumper stickers. That may well be because Texas's license plate designs convey government agreement with the message displayed.

*Id*. at 2249. Because Texas's specialty license plate designs constitute government speech, Texas was consequently entitled to refuse to issue plates featuring a private party's proposed design. *Id*. at 2253.

We note that neither *Summum* nor *Garcetti*, relied upon by Kountze ISD, nor *Johanns* or *Walker*, actually involved school speech—a crucial distinction, because "student speech claims" are different from other types of speech claims and must be evaluated "in light of the special characteristics of the school environment." *Morgan*, 659 F.3d at 375 (quoting *Morse*, 551 U.S. at 39). In *Garcetti*, the speaker was a government employee, not a private citizen or a student. 547 U.S. at 421–22. In both *Summum* and *Walker*, the speaker was the government itself, conveying a government message via a monument in a government park and specialty license plates, respectively. *Summum*, 555 U.S. at 472; *Walker* 135 S.Ct. at 2253. Here, by contrast, the Cheerleaders are not school employees, nor are they conveying the

15

government's own message. And, while *Kennedy* is an example of government speech within the public school setting, the Cheerleaders cannot be said to be public employees and thus, *Kennedy* is distinguishable. *See Kennedy*, 2017 U.S. App. LEXIS 16106, at *37.

Kountze ISD asserts that the run-through banners are prepared by the Kountze High School Cheerleaders, an official school organization, at their school-sponsored, school-supervised practices on school property. The Cheerleaders are generally required to prepare and display the banners as part of their duties. The banners are displayed on government property (the football stadium), in an area that is not generally accessible to the public (the football field), and at a time when a limited number of individuals are allowed on the field (players, cheerleaders, coaches, staff and band members). The cheerleader sponsors (paid school district employees) have the right to control the content and review and approve each of the banners before it is displayed. Kountze ISD asserts that, based on all of these factors, the Cheerleaders' speech as contained on the banners is best categorized as government speech.

On the other hand, the Cheerleaders contend that a single, dispositive fact controls the categorization of speech of the run-through banners: the school district allows the Cheerleaders to select the message that is placed on the banners.

16

Regardless of the amount of supervision of the Cheerleaders' activities, or the extent of Kountze ISD's post-selection review of the messages on the banners, because the students select the message each week and not the school, the statements on the run-through banners must be categorized as pure private speech of the Cheerleaders.

To determine whether speech or expressive conduct constitutes government speech, the Supreme Court identified three relevant factors: (1) whether the government has historically used the medium of speech as conveying a message on the government's behalf; (2) whether a reasonable observer would interpret the speech as conveying a message on the government's behalf; and (3) whether the government retained control and final authority over the content of the message. *See Walker*, 135 S.Ct. at 2248–50; *Summum*, 555 U.S. at 470–73.

Applying this three-factor test in our case, we first review the facts from the record before us to determine whether Kountze ISD has historically used run-through banners during the pregame ceremony as a means to convey a message on behalf of the school district. Kountze ISD portrayed that the purpose of the run-through banners was "to get the crowd and the football players excited." The football players run through the banner shortly after it is held up by the cheerleaders; it is displayed for up to a couple of minutes before it is destroyed by

17

the football players running through it. The purpose of the run-through banners is generally to encourage athletic excellence, good sportsmanship, and school spirit. Kevin Weldon, former Superintendent for Kountze ISD, acknowledged in his testimony that cheerleading is an extracurricular or non-curriculum activity for which students receive no grade or credit for participation. The sponsors for the cheerleaders, who are paid employees for Kountze ISD, testified that they do not have a prepared script for the banners from the school district, nor do they suggest or edit the language chosen by the cheerleaders for the banners. The sponsors provided sworn testimony that the only supervisory control they exercise over the messages on the run-through banners is to ensure that the messages do not violate school policy.[5] The sponsors, though, approved each one of the banners before it was displayed during the pregame ceremony.

While the tradition of run-through banners began decades ago, the sponsors affirmed that the banners are not required and are not always created for every game. In previous years, messages on the banners typically included negative

---

[5] This policy, contained in FNA (LOCAL) and FMA (LEGAL), provides that any student messages may not: be obscene, vulgar, offensively lewd, or indecent; likely result in a material and substantial interference with school activities or the rights of others, promote illegal drug use; violate the intellectual property rights, privacy rights, or other rights of another person; contain defamatory statements about public figures or others; or advocate imminent lawless action or are likely to incite or produce such action.

language about opposing teams, such as "Scalp the Indians" and "Beat the Bulldogs." Other examples included by the Cheerleaders included "Thrash the Tigers," "Destroy the Dogs," and "Bury the Bobcats." The Cheerleaders decided that "positive expressions would serve as a model of good sportsmanship and would be preferable over the typical derogatory language customarily seen on other run-through banners." The run-through banners are hand-painted in the Cheerleaders' handwriting, and they do not have the school or district's name anywhere on them. No school funds are used to make any of the banners; instead, they are funded by private funds. The banners are made after regular school hours.

Based on the record before us, we find that historically, Kountze ISD has not used run-through banners as a means to convey a message on behalf of the school district. This factor weighs against finding the use of a run-through banner to be pure government speech.

Second, we ask whether a reasonable observer would interpret the speech as conveying a message on the school district's behalf. The Cheerleaders are members of an organized student-activity of Kountze High School. They are required to wear an approved uniform bearing the school colors and containing the name or initials of the school at all times that they are performing their role as cheerleaders. However, the Cheerleaders purchase their own uniforms with private

19

funds. Only the football team and staff, the band, cheerleaders, and other authorized personnel are allowed on the stadium field. The Cheerleaders are allowed to display the run-through banners on the field before the game begins. The banners are unfurled on the field just before the team is announced. Immediately thereafter, the football players charge through the paper sign and it is destroyed, never to be displayed again.

While there is some potential that a reasonable person may interpret the speech as conveying a message on the school district's behalf, the Supreme Court has specifically observed that high school students "are capable of distinguishing between State-initiated, school sponsored, or teacher-led religious speech on the one hand and student-initiated, student-led religious speech on the other." *See Bd. of Educ. of Westside Comm. Sch. v. Mergens*, 496 U.S. 226, 250–51 (1990). The run-through banners are hand-painted by the Cheerleaders. Traditionally, they have used such slogans as "Destroy the Dogs" or "Scalp the Indians," words and display not readily attributable to a government entity such as the school district. The banners are hardly the type of official publication or communication that would allow a reasonable person to interpret the speech as conveying a message on the school district's behalf. Our analysis of this factor weighs against finding the use of run-through banners before a football game to be pure government speech.

Finally, we review the facts of this case to determine if Kountze ISD retained control and final authority over the content of the message. The Court interprets this factor as analyzing the extent of control exercised over the content of each run-through banner. Kountze ISD acknowledged through a resolution adopted by its Board of Trustees that, although the Superintendent and the school board retain ultimate authority to approve or disapprove of a banner, Kountze ISD has traditionally entrusted the preparation of such banners to the cheerleader squads under the authority of their sponsors. However, the resolution in question was not adopted by the school board until after the decree was issued by the Superintendent and this lawsuit was filed and a temporary restraining order issued. Therefore, for purposes of our analysis, we consider only the control and authority exercised by the school district prior to the issuance of the decree forbidding the religious language on the run-through banners. The evidence before the trial court shows that the banners are student-initiated and student-led, and Superintendent Weldon acknowledged that there was no approved script in creating the banners, nor were the Cheerleaders delivering a message that had been approved in advance by anyone with the school district. The sponsors and the Cheerleaders are expected to exercise good sense in the preparation of the banners. The sponsors review and approve the content of the banners after they are finished. The sponsors would not

21

permit "inappropriate banners," which could include, for example, banners that demonstrated poor sportsmanship or included racial slurs, as set forth above.

While the school district has shown that it exercises some editorial control over the preparation of the run-through banners, the facts fail to establish the level of control necessary to equate the Cheerleaders' speech with "government speech." First, the policy of "approving" banners to ensure they did not include obscene or objectively offensive material does not transform the Cheerleaders' speech into government speech. *Compare Johanns*, 544 U.S. at 561–62 (wherein degree of supervision resulted in government control of message conveyed) *with Pounds*, 730 F.Supp.2d at 645 (wherein school's exercise of final approval of parent-selected messages did not set the overall message communicated). The Supreme Court has held that regardless of how you might characterize the speech, schools always have the right to prevent students from delivering speech that is vulgar, lewd, profane or offensive to the school environment, even if the message would not be considered inappropriate outside of an educational environment. *Fraser*, 478 U.S. at 683 ("Surely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse."), 685 ("The First Amendment does not prevent the school officials from determining that to permit . . . vulgar and lewd speech…would undermine the school's basic

22

educational mission."). And the school district need not permit banners that advocate illegal activity, such as drug use. *Morse*, 551 U.S. at 397.

The editorial control exercised by the school district in this case cannot be said to rise to the level of control that the government exercised over the monuments it placed in its public parks in *Summum*, nor is it comparable to the absolute editorial control the State of Texas exercises over its personalized license plates. To the contrary, we find the run-through banners more akin to the bumper stickers referenced in *Walker* than the personalized license plate. The testimony of former Superintendent Weldon provides strong indication that Kountze ISD does not retain control and final authority over the content of each message painted on the run-through banners: "I commend them for what they're doing and their boldness of what they've done." This statement does not support the school district's argument that the banners are its own speech, but that it is, instead, the speech of the student cheerleaders. Therefore, this factor also weighs against finding the use of run-through banners to be pure government speech.

Kountze ISD argues further that the case of *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000), supports its claim that the run-through banners are government speech. In that case, the Supreme Court held that pregame student-led prayers were government speech because the prayers occurred "on government

23

property at government sponsored school-related events" and that the school district had not opened up its pregame ceremony to "indiscriminate use" by the general public. *Id.* at 302–303.[6] However, a careful reading of the holding shows *Santa Fe* explicitly reaffirms the basic principle that "there is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Id.* at 302 (quoting *Mergens*, 496 U.S. at 250).

In *Santa Fe*, the Supreme Court reaffirmed that the Establishment Clause of the First Amendment prohibits a school district from taking affirmative steps to create a vehicle for prayer to be delivered at a school function. *See id.* at 310–11. The Court applied that principle to hold that Santa Fe's policy of allowing students to vote on whether to have prayer before football games constitutes such an affirmative step. *Id.*

Several facts were critical to its holding. First, the school board had adopted the following policy: "The board has chosen to permit a student to deliver a brief invocation and/or message to be delivered during the pre-game ceremonies of home varsity football games to solemnize the event[.]" *Id.* at 298 n.6. Second, the

---

[6] The Supreme Court's opinion contains significant additional factual details and discussion concerning why the prayers at issue in that case were not "private speech." *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. at 303–08.

school board instituted its policy by establishing a two-step election process. *Id.* at 297. First, students voted on whether to have an invocation or message prior to football games. *Id.* at 297–98. If so, a second election was held to choose a student to do so. *Id.* Only that student was allowed to speak at the game, and the same student delivered the message at each game. *Id.* at 303.

In view of these facts, the Court rejected Santa Fe's argument that it was merely providing a neutral accommodation of private religious speech. *Id.* at 304. The Court found significant that the school policy "approv[ed] of only one specific kind of message, an 'invocation.'" *Id.* at 309. Under such circumstances, the Court concluded that "the District has failed to divorce itself from the invocations' religious content," and has crossed the line from state neutrality toward religion to state sponsorship of religion. *Id.* at 291.

In *Santa Fe*, the school district attempted to disentangle itself from the religious messages by instituting a student election process, believing it could satisfy the constitutional requirement for neutrality toward religious speech by allowing such speech to be chosen by the majority. *See id.* at 297–98. In the Court's view, however, "Santa Fe's student election system ensure[d] that only those messages deemed 'appropriate' under the District's policy [could be delivered. That is, the majoritarian process implemented by the District

25

guarantee[d], by definition, that minority candidates [would] never prevail and that their views [would] be effectively silenced." *Id.* at 304. Such a policy, the Court concluded, substitutes the views of the majority for the government neutrality required by the Establishment Clause. *Id.*

In contrast, Kountze ISD makes no claim in this case that the Cheerleaders were required or encouraged in any way to include religious messages on the banners. Likewise, there is no school policy or rule that, in actuality or effect, even suggested, much less required, the placement of religious messages on the banners. Indeed, until the school year in question, the messages painted on the banners had been entirely non-religious in nature. The extent of the school's policy concerning banners was that the cheerleaders should make banners to promote school spirit at football games. The text and content of the message, aside from the prohibition on obscene material, is, was, and always had been, left up to the discretion of the cheerleaders. Thus, we find the reasoning in *Santa Fe* to be inapposite.

Instead, we find the reasoning in *Chandler v. James*, 180 F.3d 1254 (11th Cir. 1999) (*Chandler I*) and *Chandler v. Siegelman*, 230 F.3d 1313 (11th Cir. 2000) (*Chandler II*), instructive, particularly insofar as the prayer involved in those cases was distinguished from the prayer that was actively or surreptitiously encouraged by the school in *Santa Fe*. In *Chandler I*, the Eleventh Circuit held that

26

as long as prayer at a student event was "genuinely student-initiated," it was protected private speech:

> Permitting students to speak religiously signifies neither state approval nor disapproval of that speech. The speech is not the State's--either by attribution or by adoption. The permission signifies no more than that the State acknowledges its constitutional duty to tolerate religious expression. Only in this way is true neutrality achieved.

*Chandler I*, 180 F.3d at 1261. In *Chandler II*, the Eleventh Circuit revisited its holding in *Chandler I* and reiterated that a school policy does not improperly *endorse* religion simply because it does properly *tolerate* it.[7] *Chandler II*, 230 F.3d at 1317. The court reasoned that "[t]he Establishment Clause does not require the elimination of private speech endorsing religion in public places. The Free Exercise Clause does not permit the State to confine religious speech to whispers or banish it to broom closets. If it did, the exercise of one's religion would not be free at all." *Id*. at 1316. "Private speech endorsing religion is constitutionally protected—even in school. Such speech is not the school's speech even though it may occur in the school." *Id*. at 1317.

---

[7] The record before us indicates that the policy of Kountze ISD properly tolerated religious student speech before it received a letter from the Freedom from Religion Foundation. A school district's toleration of student religious speech that happens to re-occur does not evolve into improper endorsement of religion by the school district. It is the hastily-crafted and hastily-adopted school board resolution(s) that stemmed from the letter and subsequent lawsuit that historically runs afoul of the Establishment Clause and entangles school districts in endorsement of religion violations.

In light of the record before us, applying the three-factor test set forth by the U.S. Supreme Court in *Summum* and *Walker*, we find the Cheerleaders' speech on the pregame run-through banners cannot be characterized as government speech.

**B. School-Sponsored Speech**

School-sponsored speech is a category of speech devised for the distinctive context of the public school. It is neither pure government speech nor pure private speech, but rather student expression that "may fairly be characterized as part of the school curriculum," which means that it is "supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988). Such speech may be regulated by the school so long as "editorial control over the style and content of student speech in school-sponsored expressive activities . . . [is] reasonably related to legitimate pedagogical concerns." *Id*. at 273. School-sponsored speech includes "school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." *Id.* at 271. These speech activities are school-sponsored because they "may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart

28

particular knowledge or skills to student participants and audiences." *Id.* One justification for giving schools this additional authority is to ensure that "the views of the individual speaker are not erroneously attributed to the school." *Id.* This is important, among other reasons, so that the school may refuse to sponsor student speech that would "impinge upon the rights of other students" or "associate the school with any position other than neutrality on matters of political controversy." *Id.* at 271–72. According to the Supreme Court, this level of authority was "consistent with [their] oft-expressed view that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of [] judges." *Id.* at 273. "Federal courts should only intervene in decisions to restrict school-sponsored speech when the decision has 'no valid educational purpose.'" *Pounds*, 730 F.Supp.2d at 648–49 (quoting *Hazelwood*, 484 U.S. at 273). Because the speech at issue is not pure government speech, and because the doctrines overlap to such a great extent, *see Morse*, 551 U.S. at 429–30 (Breyer, J., concurring in the judgment in part and dissenting in part), a *Hazelwood* analysis is appropriate for the sake of completeness. Kountze ISD argues that if the speech is not pure government speech, it may be analyzed under *Hazelwood*.

The speech at issue in *Hazelwood* was a high school newspaper published every three weeks by students in the school's Journalism II class. 484 U.S. at 262.

29

It was funded by the school board and supplemented by advertising sales. *Id*. The newspaper's faculty adviser submitted page proofs to the school principal before each publication. *Id*. at 263. Following one such submission, the principal withheld from publication two student-written stories, one describing the experiences of three pregnant students and another discussing the impact of divorce on students. *Id*. That led three students to file the underlying suit, alleging that the censorship violated their First Amendment Rights. *Id*. at 264. In reviewing the school's actions, the Court drew a distinction between private student speech that "happens to occur on the school premises" and school-sponsored expression, where "students, parents, and members of the public might reasonably perceive [expression] to bear the imprimatur of the school" and the expression occurs in a curricular activity. *Id.* at 270–71. Applying this standard, the Supreme Court held that the student newspaper was school-sponsored speech and that the principal acted reasonably in redacting the two pages that concerned him. *Id*. at 274–76.

The Court articulated that restriction on school-sponsored speech must be "reasonably related to legitimate pedagogical concerns." *Id*. at 273. Courts applying the *Hazelwood* standard have found this final element satisfied if the action is reasonably related to "the school district's desire to avoid controversy within a school environment." *Fleming*, 298 F.3d at 925–26. "Indeed, the

pedagogical concern in *Hazelwood* itself was to avoid the controversial subjects of pregnancy and divorce in a school setting because of the potentially disruptive nature of such subjects upon young students." *Id.* at 926; *see also, e.g.*, *Curry v. Hensiner*, 513 F.3d 570, 578 (6th Cir. 2008) (upholding school's decision to prevent a student from selling candy cane ornaments with religious messages as part of a school project; finding that the legitimate pedagogical concerns of preventing other students from being offended and/or subjected to unwanted religious messages that might conflict with their parents' religious teachings motivated the decision); *Bannon v. Sch. Dist.*, 387 F.3d 1208, 1217. (11th Cir. 2004)(finding that the legitimate pedagogical concern of avoiding disruption to the learning environment caused by controversial student-painted murals with overtly religious messages permitted the school to remove the murals); *Fleming*, 298 F.3d at 934 (holding that a high school's desire to avoid a religious debate that would be disruptive to the learning environment was a legitimate pedagogical concern). In this case, the Kountze ISD has not raised disruption of the learning environment as a concern. There was no testimony in the record that anyone made a complaint about the banners, and the cheerleaders testified that they received compliments and encouragement from the players, students from visiting schools, and the public

31

regarding their choice of wording on the run-through banners containing religious statements and references.

We find the reasoning in *Fleming* persuasive and illustrative of an example of school-sponsored speech outside of the classroom. Following the tragic shooting at Columbine High School, the school officials decided to re-open the school but made concerted efforts to change the appearance of the school building to avoid triggering any disturbing memories of the attack. *Fleming*, 298 F.3d at 920. Teachers at the school came up with an idea of having the students paint 4-inch-by-4-inch tiles that would be installed throughout the halls of the school. *Id*. The purpose of the project was two-fold: students would have an opportunity to come into the school and become more comfortable with it and, by participating in creating the tile art, they would also be a part of the reconstruction of their school. *Id.* at 920–21. To ensure that the interior of the building would remain a positive learning environment and not become a memorial to the tragedy, school administrators published various rules and guidelines for the tiles that prohibited certain language, names of the shooting victims or date of the attack, religious symbols, and anything obscene or offensive. *Id.* at 921. Tiles that did not conform to the guidelines were not to be installed. *Id*. The tiles and supplies to be used in the tile art project were paid for by private donations. *Id*.

A few of the painted tiles turned in contained messages such as "Jesus Christ is Lord," and "4/20/99 Jesus Wept," "There is no peace says the Lord for the wicked," names of victims killed in the shooting, and crosses. *Id*. at 921. The teachers supervising the painting "informed them that tiles that were inconsistent with the guidelines would be fired separately and would not be affixed to the walls, but would be given to them for their personal use." *Id*.

The tiles were screened for compliance with the guidelines by various volunteers, but due to the volume of tiles, a few that were inconsistent with the guidelines were affixed to the walls. *Id*. A school official inspected the building and noticed some inappropriate tiles that were posted and had them removed. The removed tiles included ones with crosses, gang graffiti, an anarchy symbol, a "Jewish star," the blue Columbine ribbon, a skull dripping with blood, a teacher's name on a tile the teacher painted, the date of the attack, and a mural containing red colors that some people found disturbing. *Id*. at 921–22.

Plaintiffs brought suit alleging, among other things, a violation of their free speech rights. To discern whether the expressive activity was government speech, the Tenth Circuit Court applied a four factor analysis:

> (1) whether the "central purpose" of the project is to promote the views of the government or of the private speaker; (2) whether the government exercised "editorial control" over the content of the speech; (3) whether the government was the "literal speaker"; and (4)

33

whether "ultimate responsibility" for the project rested with the government.

*Id.* at 923. Having determined through its analysis that the expressive activity was not properly characterized as government speech, the court performed a *Hazelwood* analysis to determine if it was school-sponsored speech. *Id.* The court held that

> [s]chool-sponsored speech is student speech that a school "affirmatively…promote[s], as opposed to speech that it "tolerates." Expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school constitute school-sponsored speech, over which the school may exercise editorial control, so long as [its] actions are reasonably related to legitimate pedagogical concerns.

*Id.* at 923–24 (quoting *Hazelwood*, 484 U.S. at 270–71) (internal citations omitted). The court concluded that the tile art project at Columbine High School constituted school-sponsored speech and was governed by the holding in *Hazelwood*. *Id* at 924.

While the court recognized that there may be expressive activities that occur on the school property that do not bear the imprimatur of the school, activities such as the tile art project that the school allowed to be integrated permanently into the school environment and that students pass by during the school day bore the imprimatur of the school. *Id.* at 925. "Further, the level of involvement of school officials in organizing and supervising such an event [also] affects whether that

34

activity bears the school's imprimatur." *Id*. The court held that when a tile, created pursuant to a project that the school supervised, and for which it approved funding, is displayed permanently on school grounds, and when that project aims to advance pedagogical concerns, the tile will normally be considered school-sponsored speech. *Id.* at 930. In that case, the court felt a reasonable observer would likely perceive that the school had a role in setting guidelines for, and ultimately approving, the tiles it allowed to become a part of the school itself. *Id*. "Although the painting activity took place outside of school hours and was not mandatory, the *effects* of the painting were visible on the school walls throughout the building, during the school day when children are compelled to attend." *Id*. (emphasis in original). Because the school permanently integrated the tiles into the school environment, and was significantly involved in the creation, funding, supervision, and screening process of the tile project, the court concluded that the tiles bore the imprimatur of the school and thus, the expressive activity was best categorized as school-sponsored speech. *Id*. at 931.

Further, the court found that the school's restriction on religious symbols or language on the tiles was reasonably related to a pedagogical interest. The school asserted two pedagogical reasons for its restrictions on religious references: "(1) religious references may have served as a reminder of the shooting, and (2) to

35

prevent the walls from becoming a situs for religious debate, which would be disruptive to the learning environment." *Id.* at 933.

> The critical inquiry in deciding whether speech is "school-sponsored"" under *Hazelwood* is whether it could reasonably be understood to bear the school's imprimatur, which is synonymous with "sanction" or "approval." Relevant considerations include (1) where and when the speech occurred; (2) to whom the speech was directed and whether recipients were a "captive audience"; (3) whether the speech occurred during an event or activity organized by the school, conducted pursuant to official guidelines, or supervised by school officials; and (4) whether the activities where the speech occurred were designed to impart some knowledge or skills to the students.

*Morgan*, 659 F.3d at 376. When we apply the factors under *Hazelwood* to the facts of this case, there is no clear distinction between characterizing the expressive activity involved in this case as school-sponsored speech and pure private speech. The Cheerleaders certainly prepared the run-through banners for display and delivery of their speech during a high school football game sponsored by the school district, performed on the school district's playing field, while they were fulfilling their duties as official cheerleaders for the school. The recipients are not simply going about their own business but have paid to attend the school sponsored event and thus, are more of a captive audience than not. However, we distinguish the momentary display of run-through banners containing religious-themed statements from the school-sponsored prayer that the Supreme Court found would

36

"exact religious conformity from a student as the price of joining her classmates at a varsity football game." *Santa Fe*, 530 U.S. at 312 (quoting *Lee v. Weisman*, 505 U.S. 577, 596 (1992)). The activity of displaying the run-through banner is conducted under the supervision of school officials. A factor that weighs against characterizing the speech as school-sponsored speech is that football and cheerleading are non-curriculum or extracurricular activities and, while the student athletes may certainly gain valuable life lessons from engaging in the team sports, the activities are not designed specifically to impart some specific knowledge or skills to the students in a pedagogical sense. The court in *Fleming* read the language "designed to impart particular knowledge or skills to student participants and audiences" in *Hazelwood* to mean "activities that affect learning, or in other words, affect pedagogical concerns." *Fleming,* 298 F.3d at 925. That standard was satisfied because the tile project was intended to "reacquaint[] the students with the school and participat[e] in community healing" after the tragic shootings at the school. *Id.* at 931. Here, the purpose is simply to energize the crowd and teams, in keeping with the traditional role of cheerleaders. The former Superintendent and the sponsors all agreed that cheerleading is a non-curriculum activity and is not designed to impart particular knowledge or skills as contemplated by the Supreme Court in *Hazelwood*. While Texas Friday Night football is a tradition all of its own

37

and is a great source of local community pride, football does not appear to us on this record to involve the formal pedagogical instruction contemplated by the Supreme Court in *Hazelwood*. Further, given the nature of the expressive activity—a hand-drawn, playful paper banner, displayed by cheerleaders engaged in an extra-curricular activity, only momentarily before the football team runs through the banner—it is highly unlikely that the banner would appear to those in attendance at the game to contain a message endorsed by the school.

Courts have found this final element satisfied if the action is reasonably related to "the school district's desire to avoid controversy within a school environment." *Id.* at 925–26. "Indeed, the pedagogical concern in *Hazelwood* itself was to avoid the controversial subjects of pregnancy and divorce in a school setting because of the potentially disruptive nature of such subjects upon young students." *Id*. at 926. In this case, the Kountze ISD has not raised disruption of the learning environment as a concern. Kountze ISD has not offered any evidence of the pedagogical concern implicated nor has it asserted any such concerns as the basis of the prohibition of the biblical references on the run-through banners.

Thus, we find the speech at issue is not properly characterized as school-sponsored speech.

## C. Private Speech

The first step in analyzing the appropriate constitutional standard to apply to private speech is to identify the nature of the forum in question, whether a traditional public forum, a limited public forum, or a non-public forum. *See Perry Educ. Ass'n. v. Perry Local Educators' Ass'n.,* 460 U.S. 37, 44–45 (1983). However, a detailed discussion of the forum issue is not necessary in the context of the instant case. Unless school officials have opened school facilities for indiscriminate use by the public, a school is a non-public forum, pursuant to which "school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community." *Hazelwood,* 484 U.S. at 267. There is nothing in the record to suggest that Kountze ISD opened the pre-game ceremony at football games for use indiscriminately by the general public. Therefore, it is deemed to be a non-public forum.

In *Tinker*, the Court addressed the protection students have under the First Amendment to engage in speech or demonstration on school premises. School officials may only restrict such private, personal expression to the extent it would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school," or "impinge upon the rights of other students." 393 U.S. at 509 (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (1966)).

39

The rights announced in *Tinker,* though, do not extend to several broad categories of student speech: "lewd, indecent, or offensive" speech; school-sponsored speech; and speech "that a reasonable observer would interpret as advocating illegal drug use." *Morgan*, 659 F.3d at 374.

The "private speech" at issue in *Tinker* was the "silent, passive expression of opinion" of students who wore black armbands to school to protest the Vietnam War. 393 U.S. at 508. The Supreme Court held that the black armbands worn by the students in *Tinker* are representative of the pure student expression that a school must tolerate unless it can reasonably forecast that the expression will lead to "substantial disruption of or material interference with school activities[.]" *Id.* at 514. In this case, Kountze ISD has not raised substantial disruption of or material interference with school activities as a concern. Kountze ISD has not pleaded or offered any evidence of disruption or interference as the basis for the prohibition of the biblical references on the run-through banners. In fact, the only evidence in the record is that the Cheerleaders received compliments and encouragement from those in attendance, from the community overall, the players, as well as the players and participants from opposing schools. Therefore, we conclude that the Cheerleaders' speech expressed on the run-through banners is best characterized as the pure private speech of the students.

In conclusion, taking all of the Cheerleaders' pleadings as true, we hold the Cheerleaders pleaded sufficient facts to show both a waiver of immunity and to affirmatively demonstrate that the trial court possessed jurisdiction over the dispute. *See Miranda*, 133 S.W.3d at 226. We overrule the school district's issue on appeal and affirm the trial court's ruling to deny Kountze ISD's plea to the jurisdiction.

## Standing

Kountze ISD further complains that the cheerleaders who sued lack standing to bring suit because the individual cheerleaders who sued do not represent the entire squad. Because standing implicates the trial court's subject matter jurisdiction to hear a case, we address this issue on remand. *See Nootsie, Ltd. v. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 662 (Tex. 1996). As the Texas Supreme Court has succinctly stated:

> A plaintiff must have both standing and capacity to bring a lawsuit. The issue of standing focuses on whether a party has a sufficient relationship with the lawsuit so as to have a justiciable interest in its outcome, whereas the issue of capacity is conceived of as a procedural issue dealing with the personal qualifications of a party to litigate . . . . A plaintiff has standing when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has capacity when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy.

41

*Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005). (internal citations omitted). The alleged misconduct complained of here is a violation of each student's individual right of free speech. As a general matter, injury is the "invasion of a legally protected interest[.]" *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 663 (1993).

The individual cheerleaders who sued testified that the messages on the run-through banners were decided by the unanimous consent of the cheerleader squad and that no individual cheerleader had the authority to decide the content of any message. The school district argues that, even assuming that the banners are "private speech," they would be the "private speech" of the cheerleader squad, not of the individual cheerleaders, because decisions about the content of the banners were up to the squad, not individual cheerleaders. Therefore, the school district argues that the individual cheerleaders who sued do not have standing to sue on behalf of the squad because the entire squad is not included as plaintiffs, nor even a majority of the squad.

Kountze ISD cites *Wingate v. Hajdik* for the principle that absent statutory authority, neither common law nor equity give the members of an organization the right to sue on behalf of the organization. 795 S.W.2d 717, 719 (Tex. 1990). The school district's challenge to standing misrepresents the claims of the individual

cheerleaders who sued the district. The cheerleaders who sued have initiated this lawsuit as individuals alleging their individual constitutional rights were violated. Unlike the shareholders in *Wingate*, the individual cheerleaders who are the plaintiffs in this suit are not attempting to recover damages personally for a wrong done to their organization. *Id.* at 719. Rather, the individual cheerleaders are pursuing "a personal cause of action and personal injury." *Id.*

We find no support for the argument of Kountze ISD that the cheerleaders who sued lose their individual rights to free speech by speaking as a group. The fact that multiple individual cheerleaders contributed to the final message as a group does not mean the individual cheerleaders were not harmed when the message approved by the group was suppressed.

It is undisputed that each of the individual cheerleaders who sued was represented by their parents as that respective minor's next friend and, on the date of the filing of the lawsuit, was a minor and a member of the cheerleader squad. Tex. Rule. Civ. Proc. 44. "Although a minor… may have suffered an injury and thus have a justiciable interest in the controversy, [a minor] lack[s] the legal authority to sue; the law therefore grants another party the capacity to sue on their behalf." *Lovato*, 171 S.W.3d at 849. Because each minor cheerleader was represented by next friend, and each minor has alleged a breach of her

constitutional right to freedom of speech, we conclude each minor has a justiciable interest in the controversy and thus, standing. *See id.* We overrule this issue on appeal. Having overruled all of the issues of Kountze ISD on appeal, we affirm the trial court's denial of the plea to the jurisdiction.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on April 1, 2016
Opinion Delivered September 28, 2017

Before McKeithen, C.J., Kreger and Horton, JJ.

44